**Robert W. JACKSON, III**

v.

**Carl C. DANBERG, Commissioner, Delaware Department of Correction; Thomas L. Carroll, Warden, Delaware Correctional Center; Bureau Chief**

**Paul Howard, Delaware Bureau of Prisons; Other Unknown State Actors Responsible for and Participating in the Carrying Out of Plaintiff's Execution, all in their Individual and Official Capacities Robert W. Jackson, III, individually and on behalf of the Certified Class, Appellant.**

Nos. 09–1925, 09–2052.

United States Court of Appeals, Third Circuit.

Argued Dec. 16, 2009.

Filed: Feb. 1, 2010.

Helen A. Marino, Maria K. Pulzetti, Michael Wiseman (Argued), Defender Association of Philadelphia, Federal Capital Habeas Corpus Unit, West Philadelphia, PA, Attorneys for Appellants.

Elizabeth R. McFarlan, Loren C. Meyers, Marc P. Niedzielski (Argued), Gregory E. Smith, Department of Justice, Wilmington, DE, Attorneys for Appellees.

Before FISHER, HARDIMAN and VAN ANTWERPEN, Circuit Judges.

## OPINION OF THE COURT

FISHER, Circuit Judge.

This appeal, brought by a class of inmates sentenced to death by the State of Delaware, presents two main questions for our review. First, we must decide how to interpret the Supreme Court's highly splintered opinion in *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), which upheld Kentucky's lethal injection protocol against a challenge under the Eighth Amendment of the Constitution. The second question, whose resolution is largely dependent on the outcome of the first, is whether the lethal injection method employed by Delaware violates the Eighth Amendment. We conclude that, under *Baze*, an execution protocol that does not present a substantial risk of serious harm passes constitutional muster and that, based on the record before us, Delaware's protocol presents no such risk. Accordingly, we will affirm the District Court's grant of summary judgment for Delaware and dissolve the District Court's stay.

## I.

### A. Facts[1]

Delaware, like the great majority of the more than thirty states that currently allow capital punishment, *see Baze*, 128 S.Ct. at 1527 n. 1, requires that executions be carried out by lethal injection. DEL.CODE ANN. tit. 11, § 4209(f) (2006 Supp.).[2] The statute requiring execution by lethal injection does not mandate the use of any particular drug or drugs, but does specify that

"[p]unishment of death shall ... be inflicted by intravenous [('IV')] injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead[.]" *Id.* The statute requires the Commissioner of the Delaware Department of Correction to devise procedures governing executions and to supervise executions. *See id.*

Pursuant to the authority granted by the Delaware statute, the Commissioner has devised a protocol for use during executions. The protocol has been amended several times over many years. Delaware carried out its first execution by lethal injection in 1992 under one such protocol. That protocol, like the current version, calls for the sequential IV injection of three chemicals into an inmate's bloodstream. The first chemical is sodium thiopental, which renders the inmate unconscious by inducing a coma. The second chemical is pancuronium bromide, a muscle relaxant that essentially paralyzes the inmate. Finally, the inmate's heart is stopped by an injection of potassium chloride.

Since 1992, Delaware has carried out a total of thirteen executions by lethal injection under its variably amended protocols. The execution teams involved in those executions have not always followed those protocols to the letter. In some instances, for example, the execution teams failed to administer the correct chemical dosage into the inmate's bloodstream. In other instances, the execution teams did not attend the requisite number of training ses-

---

1. Because this is an appeal from the grant of summary judgment, we view the evidence in a light most favorable to the class of death row inmates challenging Delaware's execution protocol, the nonmoving party. *See Fagan v. City of Vineland*, 22 F.3d 1296, 1299 (3d Cir. 1994) (en banc).

2. Delaware law provides that if its lethal injection protocol is held unconstitutional, executions must be carried out by hanging. DEL. CODE ANN. tit. 11, § 4209(f). Previously, Delaware permitted inmates to select whether they wished to be executed by lethal injection or hanging.

sions or verify that the equipment used during the executions was fully operational. Furthermore, Delaware officials have not consistently followed up with execution teams to determine whether a particular execution proceeded in accordance with the protocol or whether improvements in the protocol or its implementation were in order.

On August 29, 2008, Delaware instituted a new lethal injection protocol. Under the new protocol, the Commissioner and the Warden of the Delaware Correctional Center are designated as members of the execution team. The Warden selects the remaining team members from Department of Correction personnel based on a number of criteria, including length of service, ability to maintain confidentiality, maturity, willingness to participate, work performance, professionalism, staff recommendations, and review of personnel files. At least two members of the execution team are designated as members of the IV team, which may also include various specialists with at least one year of professional experience.[3] Members of the execution team are required to read the relevant portion of the protocol pertaining to their particular function and to rehearse the protocol at least three times within ninety days of a scheduled execution.

Under Delaware law, an inmate's execution is scheduled by a state trial court and must take place between the hours of 12:01 a.m. and 3:00 a.m. See DEL.CODE ANN. tit. 11, § 4209(f). No more than ten witnesses are permitted to attend an execution, including one adult member of the immediate family of the victim. See id.

Once an inmate's execution is scheduled, the new protocol calls for an individual designated by the Warden, approximately three hours before the execution, to transport the chemicals from a locked refrigerator to an "injection room," where the IV team prepares the syringes. Members of a "tie-down" team strap the inmate to a gurney in the execution chamber. After the tie-down team has exited the chamber, the IV team enters the chamber and verifies that the inmate's blood flow is not overly restricted by the gurney straps. The IV team then inserts a primary IV line and a backup IV line. If both the primary and backup lines cannot be established within one hour, the Commissioner must contact the Governor of Delaware and request that the execution be postponed. If the lines are established, the Warden signals to the IV team to administer the three-drug sequence. After the delivery of the sodium thiopental and a saline solution, the IV team must wait two minutes and check the inmate's consciousness. During this time, the curtain to the execution chamber is kept closed. The Warden calls the inmate's name out loud to observe any reaction from the inmate. At the same time, a member of the IV team assesses the inmate's consciousness by touching the inmate, shaking his shoulder, and brushing his eyelashes. If the inmate appears to be unconscious, the curtain is reopened and the Warden signals for the pancuronium bromide to be administered, followed by the potassium chloride. After two minutes have passed, if the inmate does not appear to be unconscious, the Warden must direct the IV team to discontinue use of the primary IV line and to resort to the backup IV line, beginning with a new injection of sodium thiopental. Following the injection of all three chemicals, the IV team signals the Warden that the process is complete. One of the IV team members then begins a stopwatch. If, after ten minutes, a heart

---

**3.** Those specialists include a certified medical assistant, a phlebotomist, an emergency medical technician, a paramedic, and a military corpsman.

monitor connected to the inmate does not indicate a flat line and a doctor is unable to pronounce the inmate dead, the Warden must order a new round of delivery of the three chemicals. The protocol calls for the process to continue until the inmate is declared dead.

To date, no inmate has been executed under Delaware's current lethal injection protocol.

## B. Procedural History

In May 2006, Robert W. Jackson, III [4] initiated this lawsuit by filing a complaint in the United States District Court for the District of Delaware against various known and unknown Delaware officials (collectively referred to in this opinion as "Delaware").[5] Jackson asserted a claim under 42 U.S.C. § 1983,[6] alleging that Delaware's then-effective lethal injection protocol violated his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments of the Constitution. He sought temporary and permanent injunctive relief to prevent his execution by lethal injection until Delaware's protocol was brought into conformity with constitutional standards. Within days of filing his complaint, Jackson moved for a preliminary injunction to prevent his execution, which was then scheduled for May 19, 2006. The District Court granted that

motion and stayed Jackson's execution. Thereafter, on Jackson's motion the District Court certified Jackson's proposed class of Delaware death row inmates (collectively referred to in this opinion as the "Plaintiffs") and appointed class counsel.

In September 2007, the District Court postponed a then-impending trial date in light of the Supreme Court's grant of the petition for a writ of certiorari in *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). In August 2008, after *Baze* was decided, Delaware notified the District Court that it had revised its lethal injection protocol. In December 2008, Delaware moved for summary judgment, essentially arguing that its new protocol was substantially similar to the one *Baze* found constitutional. The District Court held a hearing on the motion and, in March 2009, granted it in full. *Jackson v. Danberg*, 601 F.Supp.2d 589 (D.Del.2009). In its ruling, the District Court saw its inquiry as twofold: first, whether the Plaintiffs could show that Delaware would likely fail to comply with its new protocol given its historical noncompliance with its old protocol; and second, assuming an affirmative answer to the first inquiry, whether the Plaintiffs could show that Delaware's history of noncompliance presented an objectively intolerable risk of harm in the future. As to the first inquiry, the District Court declined what it perceived as the

---

**4.** Jackson was convicted and sentenced to death for the 1992 murder of Elizabeth Girardi. *See Jackson v. State*, 684 A.2d 745 (Del. 1996); *Jackson v. State*, 643 A.2d 1360 (Del. 1994).

**5.** The complaint named the following defendants: Stanley W. Taylor, Jr., Commissioner, Delaware Department of Correction; Thomas L. Carroll, Warden, Delaware Correctional Center; Paul Howard, Bureau Chief, Delaware Bureau of Prisons; and other unknown Delaware officials. In February 2007, the District Court substituted Taylor with his successor, Carl C. Danberg.

**6.** 42 U.S.C. § 1983 provides in part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

Plaintiffs' invitation to "assume that future conduct by different personnel under a new lethal injection protocol in a different legal environment will reflect past conduct by former personnel under a now rejected protocol." *Id.* at 598. In the Court's view, the Plaintiffs' theory would require a finding that "the new protocol is simply too complicated for a State to carry out … or that Delaware's personnel will intentionally ignore the requirements of the new protocol in order to intentionally cause undue pain and suffering." *Id.* The District Court concluded that *Baze* foreclosed the former proposition and that the record did not support either proposition. The Court further found that, even assuming the Plaintiffs' evidence regarding future harm had record support, such harm did not raise constitutional concerns. The Court explained that the only evidence the Plaintiffs had proffered in this regard related to the November 2005 execution of Brian Steckel. Steckel's execution had been prolonged by the slow delivery of sodium thiopental into his bloodstream, the District Court wrote, but that fact alone did not provide a sufficient basis for concluding that there was a "substantial risk of an inadequate dose of sodium thiopental under the new protocol." *Id.* at 599. Given this evidentiary deficiency, the Court held that the Plaintiffs had failed to show that "any maladministration of the new protocol [was] very likely to pose an objectively intolerable risk of harm.'" *Id.* (quoting *Baze*, 128 S.Ct. at 1531) (internal quotation marks and footnote omitted). According-ly, the District Court found that there were no genuine questions of material fact in dispute and granted summary judgment for Delaware. The Court, apparently acting *sua sponte*, simultaneously ordered its May 2006 stay of Jackson's execution to remain in effect pending appeal.[7]

The Plaintiffs have timely appealed the District Court's grant of summary judgment for Delaware. Delaware has timely appealed the District Court's stay pending appeal.[8]

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the purely legal question of how a Supreme Court decision is to be interpreted. *See Kadelski v. Sullivan*, 30 F.3d 399, 400 (3d Cir.1994). We exercise plenary review over the District Court's grant of summary judgment. *See Alexander v. Nat'l Fire Ins. of Hartford*, 454 F.3d 214, 219 n. 4 (3d Cir.2006); *Kingvision Pay–Per–View, Corp. v. 898 Belmont, Inc.*, 366 F.3d 217, 220 (3d Cir. 2004). To that end, we are "required to apply the same test the district court should have utilized initially." *Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co. of Md.*, 989 F.2d 635, 637 (3d Cir.1993) (quotation marks and citation omitted). Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

---

**7.** Of course, no party had filed a notice of appeal at the time of the District Court's ruling. The District Court evidently presumed—correctly, as it turned out—that an appeal was forthcoming.

**8.** Following the docketing of the parties' respective appeals, the Plaintiffs moved to remand for the District Court to reconsider its summary judgment ruling or, in the alterna-tive, for additional fact-finding and supplemental briefing to be submitted to this Court. Delaware moved to strike that request. This Court granted the Plaintiffs' motion insofar as it sought permission to file supplemental briefs and denied Delaware's motion to strike as moot. Both parties have filed supplemental briefs.

entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether such relief is warranted, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. We review a district court's decision to grant a stay pending appeal for abuse of discretion. *See, e.g., Republic of Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991).

## III.

### A. The Meaning of *Baze*

The Eighth Amendment, which applies to the states by virtue of the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII; *see Baze*, 128 S.Ct. at 1529. In *Baze*, the petitioners challenged Kentucky's lethal injection protocol under the Eighth Amendment. Conceding that Kentucky's protocol would pass constitutional scrutiny if implemented as intended, they based their challenge on the risk that they would suffer significant pain if the protocol were not fully observed. Kentucky's protocol, like Delaware's current protocol, calls for the sequential injection of sodium thiopental, pancuronium bromide, and potassium chloride. A state trial court held a several-day bench trial, during which it heard from approximately twenty witnesses, and concluded that there was minimal risk that the protocol would be maladministered. The Kentucky Supreme Court affirmed.

The United States Supreme Court granted certiorari and likewise affirmed.

Chief Justice Roberts authored the plurality opinion, which Justice Kennedy and Justice Alito joined. Beginning from the premise—which neither party disputed—that capital punishment is constitutional, the plurality rejected the petitioners' argument that Kentucky should adopt a one-drug, instead of a three-drug, protocol and their accompanying invitation to adopt an "unnecessary risk" standard in adjudicating Eighth Amendment claims. *Id.* at 1532. Instead, the plurality held that to prevail on such a claim an inmate must show that there is "a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* at 1531 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 & n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Recognizing that "[s]ome risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required procedure[,]" the plurality explained that "subjecting individuals to a risk of future harm ... can qualify as cruel and unusual punishment." *Id.* at 1529–30. To prevail on a claim that the exposure to such risk runs afoul of the Constitution, an inmate must demonstrate that "the conditions presenting the risk must be *'sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Id.* at 1530–31 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34–35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). An inmate falls short of that burden by showing only that "an execution method may result in pain, either by accident or as an inescapable consequence of death[.]" *Id.* at 1531.

The plurality was unpersuaded by the petitioners' contention that Kentucky should adopt a one-drug protocol because

of the risk that the first drug in the three-drug protocol might be maladministered. *See id.* at 1533. While acknowledging that, "failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride[,]" *id.*, the plurality nevertheless wrote that "a condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." *Id.* at 1531. The plurality explained that "[p]ermitting an Eighth Amendment violation to be established on such a showing would threaten to transform courts into boards of inquiry charged with determining 'best practices' for executions, with each ruling supplanted by another round of litigation touting a new and improved methodology" and "would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures—a role that by all accounts the States have fulfilled with an earnest desire to provide for a progressively more humane manner of death." *Id.* (citation omitted). The plurality did not categorically preclude an inmate from proving an Eighth Amendment violation in light of a safer alternative, but it did impose a heavy burden on an inmate seeking to make such a showing. Specifically, in the words of the plurality, the inmate's

> proffered alternatives must effectively address a "substantial risk of serious harm." To qualify, the alternative procedure must be feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain. If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate peno-

logical justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as "cruel and unusual" under the Eighth Amendment.

*Id.* at 1532 (internal citation and footnote omitted).

Applying these principles to the facts before it, the plurality found that the petitioners had failed to establish that there was a substantial risk of maladministration of Kentucky's protocol. The plurality saw no clear error in the trial court's determination that mixing the drugs was relatively uncomplicated and pointed to the protocol's various safeguards ensuring an adequate delivery of sodium thiopental. Specifically, the Court highlighted the protocol's requirements that IV team members have at least one year of professional experience; that execution team members participate in at least ten yearly practice sessions; and that the warden and deputy warden be present in the execution chamber to watch for signs of IV problems. *See id.* at 1533–34. In light of these safeguards, the plurality concluded that "the risks identified by petitioners are [not] so substantial or imminent as to amount to an Eighth Amendment violation." *Id.* at 1534.

Finally, the plurality responded to the suggestion of Justice Stevens, who concurred in the judgment, that the plurality opinion would "leave[ ] the disposition of other cases uncertain," by explaining as follows:

> A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. He must show that the risk is substantial when compared to the known and available alternatives. *A*

*State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.*

*Id.* at 1537 (emphasis added).[9]

In his concurrence in the judgment, Justice Stevens, in addition to raising the abovementioned concern that the plurality found ungrounded, questioned the utility of pancuronium bromide in three-drug protocols, given the risk that "the inmate will suffer excruciating pain before death occurs[,]" *id.* at 1543 (Stevens, J., concurring in the judgment), and suggested that states consider eliminating it from their protocols. *Id.* at 1546 (Stevens, J., concurring in the judgment). Justice Stevens stated his understanding that the death penalty is constitutional as a general matter in light of the Court's precedents and determined that the petitioners had failed to meet their burden of showing that Kentucky's protocol was unconstitutional under those precedents, whether interpreted by the plurality or the dissent. *Id.* at 1552 (Stevens., J., concurring in the judgment). However, he also "relied on [his] own experience in reaching the conclusion that the imposition of the death penalty represents the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Id.* at 1551 (Stevens, J., concurring in the judgment) (internal quotation marks omitted).[10]

Justice Thomas, with whom Justice Scalia joined, concurred in the judgment, and thought *Baze* "an easy case." *Id.* at 1563 (Thomas, J., concurring in the judgment). In his view, the plurality's standard was both unsupported by Eighth Amendment jurisprudence and amorphous, rendering it difficult for lower courts to apply. *See id.* at 1556, 1561–62 (Thomas, J., concurring in the judgment). According to Justice Thomas, the relevant inquiry in an Eighth Amendment challenge is whether the challenged method of execution is designed to inflict pain. *See id.* at 1563 (Thomas, J., concurring in the judgment). "Because Kentucky's lethal injection protocol is designed to eliminate pain rather than to inflict it," Justice Thomas wrote, the "petitioners' challenge must fail." *Id.* (Thomas, J., concurring in the judgment).

Justice Breyer concurred in the judgment as well. He agreed with Justice Ginsburg's dissenting opinion that a court should evaluate several factors to determine the constitutionality of a state's execution protocol, but thought that "the legal merits of the kind of claim presented must inevitably turn not so much upon the wording of an intermediate standard of review as upon facts and evidence." *Id.* (Breyer, J., concurring in the judgment). Based on both "the record in this case [and] . . . the literature on the subject," Justice Breyer could not find "sufficient

---

**9.** While he joined in the plurality opinion, Justice Alito also concurred separately "to explain . . . how the holding should be implemented." *Baze,* 128 S.Ct. at 1538 (Alito, J., concurring). He wrote that because ethical considerations prohibit the participation of certain medical professionals in executions, "a suggested modification of a lethal injection protocol cannot be regarded as 'feasible' or 'readily' available if the modification would require participation—either in carrying out the execution or in training those who carry out the execution—by persons whose professional ethics rules or traditions impede their

participation." *Id.* at 1540 (Alito, J., concurring). In this case, the Plaintiffs have suggested no such modification to Delaware's protocol.

**10.** Justice Scalia, who joined in Justice Thomas' concurrence in the judgment, wrote separately, in a concurrence in the judgment in which Justice Thomas joined, to respond to Justice Stevens' personal repudiation of capital punishment. *See Baze,* 128 S.Ct. at 1552–56 (Scalia, J., concurring in the judgment).

evidence that Kentucky's execution method poses the significant and unnecessary risk of inflicting severe pain that petitioners assert." *Id.* 1563–64 (Breyer, J., concurring in the judgment) (internal quotation marks and record citation omitted).

Finally, Justice Ginsburg, with whom Justice Souter joined, dissented. In Justice Ginsburg's view, "[t]he constitutionality of Kentucky's protocol ... turn[ed] on whether inmates are adequately anesthetized by the first drug in the protocol, sodium thiopental." *Id.* at 1567 (Ginsburg, J., dissenting). She agreed with the plurality that "the degree of risk, magnitude of pain, and availability of alternatives must be considered," but concluded that these factors "are interrelated [such that] a strong showing on one reduces the importance of the others." *Id.* at 1568 (Ginsburg, J., dissenting). The "critical question," according to Justice Ginsburg, "is whether a feasible alternative exists." *Id.* at 1569 (Ginsburg, J., dissenting). Contrasting the relatively deficient safeguards in Kentucky's protocol with the greater safeguards included in other states' protocols, Justice Ginsburg would have remanded "with instructions to consider whether the failure to include readily available safeguards to confirm that the inmate is unconscious after injection of sodium thiopental, in combination with the other elements of Kentucky's protocol, creates an untoward, readily avoidable risk of inflicting severe and unnecessary pain." *Id.* at 1572 (Ginsburg, J., dissenting).

To summarize, the plurality announced a standard governing challenges to lethal injection protocols in line with select strains of the Court's conditions-of-confinement Eighth Amendment jurisprudence. Justices Stevens and Justice Breyer found simply that the petitioners had failed to meet their burden on the facts of this particular case, but for different reasons. And Justice Thomas, joined by Justice Scalia, concluded that the Eighth Amendment only prohibits deliberate efforts to inflict pain. Finally, Justice Ginsburg, joined by Justice Souter, adopted an "untoward, readily avoidable risk" test for assessing method-of-execution challenges. *Id.* at 1567 (Ginsburg, J., dissenting).

■ Ordinarily, we apply the standard or standards endorsed by a majority of Justices when interpreting Supreme Court precedent. *See Planned Parenthood of Se. Pa. v. Casey,* 947 F.2d 682, 693 (3d Cir.1991) ("In a run-of-the-mill case where a majority of the Justices endorse a single legal standard, lower courts simply follow that standard." (internal citation omitted)), *modified on other grounds,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). As our discussion above demonstrates, *Baze* is not an ordinary case. Unlike most Supreme Court decisions, *Baze* is highly fractured. As a result, we must identify the Court's holding by employing the framework set out in *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).[11] *See, e.g., Am. Civil*

---

**11.** Some courts have assumed, with little or no explicit analysis, that the plurality opinion in *Baze* announced the holding of the Court and thus that the plurality's interpretation of the Eighth Amendment is binding on lower courts. *See, e.g., Harbison v. Little,* 571 F.3d 531, 535 (6th Cir.2009) ("Chief Justice Roberts's plurality opinion is controlling."); *Clemons v. Crawford,* 585 F.3d 1119, 1125–26 (8th Cir.2009) (analyzing the plurality opinion as the Court's holding); *Emmett v. Johnson,*

532 F.3d 291, 298–99 (4th Cir.2008) (same); *but see Cooey v. Strickland,* 610 F.Supp.2d 853, 919 (S.D.Ohio 2009) ("Absent a controlling rationale set forth by a majority of the high court, what can be gleaned from the diverse array of opinions in *Baze* is debatable."); *Ventura v. State,* 2 So.3d 194, 200 (Fla.2009) (per curiam) ("[T]here are no reliable means of determining the 'narrowest grounds' presented in *Baze* because three blocks of Justices provided three separate

*Liberties Union of N.J. v. Schundler,* 168 F.3d 92, 103 (3d Cir.1999).

 In *Marks v. United States,* the Supreme Court instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds[.]" 430 U.S. at 193, 97 S.Ct. 990 (internal quotation marks and citation omitted); *see also Planned Parenthood,* 947 F.2d at 694 n. 7 ("When six or more Justices join in the judgment and they issue three or more opinions, ... the idea is to locate the opinion of the Justice or Justices who concurred on the narrowest grounds *necessary to secure a majority.").* *Marks'* "principal objective ... is to promote predictability in the law by ensuring lower court adherence to Supreme Court precedent." *Planned Parenthood,* 947 F.2d at 693. "This objective requires that, *whenever possible,* there be a single legal standard for the lower courts to apply in similar cases and that this standard, when properly applied, produce results with which a majority of the Justices in the case articulating the standard would agree." *Id.* (emphasis added). That objective notwithstanding, *Marks* applies "only where one opinion can be meaningfully regarded as 'narrower' than another and can repre- sent a common denominator of the Court's reasoning." *Berwind Corp. v. Comm'r of Soc. Sec.,* 307 F.3d 222, 234 (3d Cir.2002) (internal quotation marks and citation omitted). "Therefore, 'in cases where approaches differ, no particular standard is binding on an inferior court because none has received the support of a majority of the Supreme Court.'" *Id.* (quoting *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3d Cir.1999)).

Both the Supreme Court and this Court have recognized the difficulty of applying *Marks* under certain circumstances. *See Grutter v. Bollinger,* 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); *Nichols v. United States,* 511 U.S. 738, 745, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994) ("This test is more easily stated than applied[.]"); *Horn v. Thoratec Corp.,* 376 F.3d 163, 175 (3d Cir.2004) ("Splintered opinions by the Supreme Court often result in some confusion as to which opinion or rationale is binding on the lower federal courts."); *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 658 (3d Cir.1999) ("The splintered nature of the Court makes it difficult to distill a guiding principle[.]"); *Rappa v. New Castle County,* 18 F.3d 1043, 1057 (3d Cir.1994) ("[I]t is not always possible to discover a single standard that legitimately constitutes the narrowest ground for the decision."). Indeed, in *Nichols* the Supreme Court found it "not useful to pursue

standards for determining the constitutionality of a mode of execution."). The parties in this case apparently agree that the *Baze* plurality controls, and have not briefed the issue. We certainly understand the allure of such an approach, as it ensures that one readily identifiable set of standards governs the outcome here. Significantly, however, that approach ignores the fact that "[a] plurality opinion does not ... essentially differ in character from either a concurring opinion or a dissenting opinion. Those joining in a plurality opinion may speak with authority accorded wise men, but their voices do not carry the authority of the Supreme Court as an institution." *Rappa v. New Castle County,* 18 F.3d 1043, 1058 n. 21 (3d Cir.1994) (quotation omitted). Furthermore, we are convinced that a more developed analysis of *Baze* is warranted under *Marks* and our precedents. *See, e.g., Horn v. Thoratec Corp.,* 376 F.3d 163, 175–76 (3d Cir.2004) (analyzing the holding of a splintered opinion); *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 169–72 (3d Cir.1999) (same); *Unity Real Estate Co. v. Hudson,* 178 F.3d 649, 656–59 (3d Cir.1999) (same).

the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it." 511 U.S. at 745–46, 114 S.Ct. 1921.

To understand how *Marks* works here, we find it useful to consider the genesis of the framework *Marks* constructed. *Marks* came to the Supreme Court following the petitioners' convictions under a statute prohibiting the transportation of obscene materials in interstate commerce. The petitioners had argued in the district court that the jury instructions regarding what constitutes obscenity should be derived from the Court's decision in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) ("*Memoirs*"). The district court disagreed and instructed the jury in line with the Court's decision in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), which was decided after the conduct giving rise to the petitioners' prosecutions but before trial began.[12] Although the main question presented in Marks was whether the standards in *Miller* could be applied retroactively in a criminal prosecution under the Ex Post Facto Clause of the Constitution, the Court first had to decide whether any of the rules announced in *Memoirs*, given the Justices' distinct approaches in that case, supplanted the rule earlier formulated in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

In *Roth*, a majority of the Justices had established the following test for distinguishing obscenity from protected speech:

"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." *Id.* at 489, 77 S.Ct. 1304. That test differed from the several tests articulated some years later by a highly fractured *Memoirs* Court. There, the Court vacated a conviction under a state obscenity law on First Amendment grounds. The three-Justice plurality found that "[a] book cannot be proscribed unless it is found to be utterly without redeeming social value." *Memoirs*, 383 U.S. at 419, 86 S.Ct. 975 (emphasis omitted). Justice Douglas concurred in the judgment, reiterating the position he had taken in *Roth* that "the First Amendment leaves no power in government over expression of ideas." *Id.* at 433, 86 S.Ct. 975 (Douglas, J., concurring in the judgment) (emphasis omitted). Justice Black concurred in the judgment for much the same reason: in his view, no expressive activity could be criminalized under the First Amendment. *See id.* at 421, 86 S.Ct. 975 (Black, J., concurring in the judgment).[13] Finally, Justice Stewart likewise concurred in the judgment, though on the ground that, in his view, only "hardcore pornography" could be criminalized. *See id.* (Stewart, J., concurring in the judgment).[14]

The *Marks* Court reasoned that because Justice Black and Justice Douglas had concurred in the judgment based on their "position that the First Amendment provides an absolute shield against governmental action aimed at suppressing obscenity[,]" the plurality's view "constituted the holding of the Court and provided the governing standards." *Marks*, 430 U.S. at

---

**12.** The petitioners wanted *Memoirs'* standards to govern in their prosecutions because those standards were more favorable to the defense than those announced in *Miller*.

**13.** Justice Black wrote nothing new in *Memoirs*. Instead, he referred to his dissenting

opinion in *Mishkin v. New York*, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966).

**14.** Like Justice Black, Justice Stewart referred to his dissenting opinion in another case, *Ginzburg v. United States*, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).

193–94, 97 S.Ct. 990. That was so, the Court reasoned, because any material that could not be criminalized under the plurality's test perforce could not be criminalized under the absolutist approach of Justice Black and Justice Douglas. *Id.* In other words, the plurality's test represented the "narrowest grounds" of the concurring opinions. Thus, the Court concluded that *Roth*'s test had been replaced by the test of the *Memoirs* plurality because a majority of the *Memoirs* Court had declined to follow *Roth.* *Id.*

*Marks'* "narrowest grounds" language in turn sprang from *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Gregg,* the Court reviewed its decision a few years earlier in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), where the Justices had declared Georgia's death penalty statute unconstitutional, though for different reasons. Two Justices had based their decision on their view that the death penalty is always unconstitutional, while three others had held that the statute was unconstitutional based on the administration of the death penalty in Georgia at that time. Confronted with this circumstance, the *Gregg* Court concluded that "[s]ince five Justices wrote separately in support of the judgments in *Furman,* the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Gregg,* 428 U.S. at 169 n. 15, 96 S.Ct. 2909. The "narrowest grounds" in that case meant the opinions of the three Justices

who did not subscribe to an absolute proscription of capital punishment.

For purposes of this appeal, the salient takeaway from *Marks* and *Gregg,* and the cases they examined, is that the *Marks* framework applies where one opinion is clearly "narrower" than another, that is, where one opinion would always lead to the same result that a broader opinion would reach. The controlling opinion in *Memoirs,* for instance, was the plurality opinion because that opinion would find material constitutionally protected in every instance in which Justices Black and Douglas would so find. Similarly, the non-controlling concurring opinions in *Furman* would strike down death penalty statutes as unconstitutional in all cases, while the controlling concurring opinions would do so in only a subset of those cases. The scenarios presented in *Marks* and *Furman* strongly resemble the one we confront here. The plurality standard in *Baze* would find some lethal injection protocols unconstitutional and others constitutional, while Justice Thomas and Justice Scalia would find any lethal injection protocol constitutional unless it were deliberately designed to inflict pain. Put another way, the plurality is controlling when combined with Justice Thomas' concurrence in the judgment because any lethal injection protocol constitutionally acceptable to the plurality would invariably pass Justice Thomas' *per se* rule.[15] The plurality opinion is clearly "narrower" than Justice Thomas's concurrence in the judgment. Accordingly, we hold that the plurality opinion in

---

**15.** *Rappa v. New Castle County,* 18 F.3d 1043 (3d Cir.1994), does not compel a contrary conclusion. There, we declined to extract a binding rule from *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), because "the plurality and the concurrence took such markedly different approaches to [deciding whether a city ordinance violated the First Amendment] that there is no common denominator between them." *Rappa,* 18 F.3d at 1058. *Metromedia*

produced five separate opinions and involved factual and legal circumstances quite distinguishable from those we face here.

In a footnote in *Rappa,* we pointed out that while "it would be possible to predict the outcome in almost every case simply by counting the votes of the Justices[,]" which would "have the advantage of creating some predictability[,] ... such a system would be unprincipled" because it would not be "root-

*Baze* controls Eighth Amendment method-of-execution challenges.

## B. The Grant of Summary Judgment

To survive summary judgment under *Baze*, the Plaintiffs must point to record evidence from which a reasonable fact finder could infer that Delaware's protocol does not meet the standards governing the constitutionality of an execution protocol as articulated by Chief Justice Roberts in the plurality opinion.[16]

The parties do not dispute that Delaware's protocol is in all material respects

---

ed in any consistent constitutional values." *Id.* at 1060 n. 24. Importantly, these statements were mere dicta, and thus lack binding force. *See N. Jersey Media Group v. Ashcroft,* 308 F.3d 198, 201 (3d Cir.2002). Indeed, "we give such statements respect consistent with their persuasive value and can, of course, accord dicta as much weight as we deem appropriate." *Galli v. N.J. Meadowlands Comm'n,* 490 F.3d 265, 274 (3d Cir. 2007) (internal citations and quotation marks omitted). While we do not retreat from *Rappa*'s general admonition concerning the potential problems with simple vote-counting, we do not find it applicable to the circumstances *Baze* presents.

16. The Plaintiffs argue that the District Court erred by applying *Baze*'s "substantially similar" standard to this case. That is, in their view the District Court impermissibly found Delaware's protocol constitutional simply because it was substantially similar to Kentucky's. We disagree that the District Court did no more than apply that standard. But to the extent it did, we do not believe that such an approach is necessarily impermissible. We believe that in addition to establishing the substantial risk standard, *Baze* also stands for the proposition that Kentucky's protocol, on its face, did not present a substantial risk of serious harm. Therefore, any protocol substantially similar to Kentucky's protocol, without more, would survive under the plurality standard. That conclusion finds ample support in the case law. *See, e.g., Harbison,* 571 F.3d at 536 (Tennessee); *Clemons,* 585 F.3d at 1126–27 (Missouri); *Wellons v. Hall,* 554 F.3d 923, 942 (11th Cir.2009) (Georgia), *abrogated on other grounds, Cone v. Bell,* — U.S. ——, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009), *as recognized in Owen v. Sec'y for Dep't of Corrs.,* 568 F.3d 894, 915 n. 23 (11th Cir. 2009); *Emmett,* 532 F.3d at 300 (Virginia); *Bennett v. State,* 990 So.2d 155, 160–61 (Miss. 2008).

The Plaintiffs also argue that whether a method of execution presents the degree of risk described by *Baze* turns not only on objective fact, but on whether state officials are deliberately indifferent to that risk. They point out that *Baze* drew heavily from the Supreme Court's prior cases involving conditions of confinement and Eighth Amendment concerns. To be sure, *Baze*'s "sure or very likely" and "sufficiently imminent" language was taken from the Court's decision in *Helling v. McKinney,* 509 U.S. 25, 33–34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993), where the Court held that an inmate could assert an Eighth Amendment claim based on the health risk posed by exposure to second-hand smoke, and explained that "a claim that the conditions of a prisoner's confinement violate the Eighth Amendment requires an inquiry into the prison officials' state of mind." *Id.* at 32, 113 S.Ct. 2475 (citation omitted). Similarly, *Baze*'s "objectively intolerable risk of harm" language comes from *Farmer v. Brennan,* 511 U.S. 825, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), where the Court built on *Helling* by holding that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970.

While *Baze* captured some of the language in *Helling* and *Farmer,* importantly, it did not import the "deliberate indifference" language used in those cases. The fact that *Baze* took such pains to extract certain language from *Helling* and *Farmer* suggests that the other standards announced in those cases do not govern Eighth Amendment method-of-execution challenges. That distinction makes sense, as the Supreme Court's Eighth Amendment conditions-of-confinement cases and method-of-execution cases have separate lineages in the Court's jurisprudence. *Cf. Taylor v. Crawford,* 487 F.3d 1072, 1080–81 (8th

identical to the protocol the Supreme Court found constitutional in *Baze.* Indeed, when the District Court asked the Plaintiffs to identify any differences between the two protocols, the Plaintiffs acknowledged that they had "not identified any substantive differences between the two protocols *as written.*" (App. 329 (emphasis in original).) As they did before the District Court, the Plaintiffs argue on appeal that the focus of judicial inquiry should be not on the two protocols' written similarities but on extra-protocol elements that, in their view, establish the substantial risk that was found wanting in *Baze.* Those elements may be fairly divided into three classes: (1) Delaware's historical noncompliance with its former protocol; (2) the current protocol's lack of a backup plan; and (3) the existence of an allegedly better, one-drug protocol that has been imple-

mented and used in Ohio. None of the evidence the Plaintiffs have adduced helps them meet their burden under *Baze.* We address each evidentiary proffer in turn.

### 1. Evidence of Historical Noncompliance

■ Evidence of Delaware's noncompliance with its former protocol exists because of an important distinction between that protocol and the Kentucky protocol at issue in *Baze.* In *Baze,* Kentucky had executed but one inmate since its adoption of lethal injection. *See* 128 S.Ct. at 1528. Delaware, in contrast, has executed thirteen inmates since 1992, albeit under a now-defunct protocol. In the Plaintiffs' view, Delaware's allegedly substandard performance in implementing that protocol creates a genuine question of material fact

Cir.2007) (noting the difference between a "conditions-of-confinement claim challenging prison conditions in general," where a state-of-mind inquiry is obligatory, and cases involving "state-sanctioned punishment"). Furthermore, even a cursory comparison of the different circumstances giving rise to these two types of Eight Amendment challenges bears out why subjective conditions-of-confinement standards do not govern method-of-execution challenges. In *Farmer,* the Court explained that "[w]hether a prison official had the requisite knowledge of substantial risk is a question of fact subject to demonstration in the usual ways, including ... [by providing] evidence ... that the defendant-officials were at the time [the] suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so[.]" 511 U.S. at 842, 846, 114 S.Ct. 1970 (internal quotation marks and citation omitted). The problem with applying such evidentiary standards in method-of-execution cases is that, in cases where a lethal injection protocol is facially constitutional, there can never be a "current" violation in the way there may be, for example, in cases where an inmate is suffering the harmful effects of second-hand smoke or finds himself at risk of physical harm at the hands of

dangerous fellow inmates. In short, we see no support for the Plaintiffs' position that *Baze* requires the wholesale engraftment of the evidentiary standards articulated in the Supreme Court's conditions-of-confinement cases onto method-of-execution cases.

In any event, to the extent the Plaintiffs maintain that they were denied purportedly vital discovery into Delaware officials' state of mind, the record suggests otherwise. If the Plaintiffs wanted to show Delaware officials' deliberate indifference to the risks associated with the state's lethal injection protocol, the Plaintiffs had only to ask those officials if they were aware of those risks. Nothing in the record intimates that the District Court cut off that line of questioning. To the contrary, the record reflects that the District Court gave the parties relatively wide latitude in crafting their discovery inquiries. Thus, even assuming *Helling's* and *Farmer's* subjective standards apply to method-of-execution cases, the Plaintiffs have given us no principled explanation for their failure to request the very information to which they now assert an entitlement. In other words, the Plaintiffs cannot now complain about discovery that they did not request in the District Court proceedings and that the District Court, as far as the record reveals, did not preclude them from requesting.

as to whether Delaware, going forward, will repeat the mistakes of the past.

The Plaintiffs spotlight, for instance, Delaware's failure on several occasions to administer the correct dosage of potassium chloride. While it is uncontested that an inmate would very likely suffer immeasurable pain if given an injection of potassium chloride without being rendered unconscious by a proper dosage of sodium thiopental, the record is bereft of evidence that any of the thirteen inmates Delaware has executed using the three-drug protocol was still conscious when injected with potassium chloride.[17] The importance of that evidentiary deficiency cannot be understated, since the constitutionality of Kentucky's protocol rested on the effective anesthetization of an inmate, as both the plurality and the dissent in *Baze* recognized. *See* 128 S.Ct. at 1533 (plurality opinion) ("Th[is] claim hinges on the improper administration of the first drug, sodium thiopental."); *id.* at 1567 (Ginsburg, J., dissenting) ("The constitutionality of Kentucky's protocol . . . turns on whether inmates are adequately anesthetized by the first drug in the protocol, sodium thiopental."). There is no evidence to support the proposition, advanced by the Plaintiffs here, that administering to a properly anesthetized inmate a lesser or greater dosage of potassium chloride than called for in a lethal injection protocol presents a substantial risk of serious harm. Indeed, it is undisputed that, if an inmate is properly anesthetized, no such risk can materialize. As a consequence, the Plaintiffs cannot meet their summary judgment burden by relying on examples of Delaware's maladministration of potassium chloride to an unconscious inmate.

The Plaintiffs also place great weight on Delaware's execution of Brian Steckel in November 2005. During his execution, Steckel's primary IV line became infiltrated during the administration of sodium thiopental. Steckel clearly was still conscious when the IV team noticed the problem. After unsuccessful attempts to repair the primary line, the IV team rerouted the sodium thiopental to Steckel's backup line, thereby prolonging his execution. The Plaintiffs assert that the District Court erroneously credited deposition testimony reflecting that Steckel received the appropriate dosage of sodium thiopental while discounting other evidence indicating that he had not received the appropriate dosage of that drug. According to the Plaintiffs, if "Steckel did not receive an adequate dose of anesthesia, his execution was inhumane, which bears heavily on the likelihood of future maladministration." (Appellants' Op. Br. 41–42.)

As discussed above, the proper administration of sodium thiopental is an indispensable link in the lethal injection chain for Eighth Amendment purposes, as it ensures that an inmate will not suffer under the effects of the second two drugs. *See Baze*, 128 S.Ct. at 1527 ("The proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs." (record citations omitted)). Even assuming that Steckel suffered great pain during his botched execution, however, does not preclude summary judgment for Delaware, as *Baze* left no room for doubt that a single instance of mistake does not

---

17. As discussed in greater detail below, the delivery of sodium thiopental to one of the inmates whom Delaware has executed took longer than planned. Importantly, however, there is no suggestion in the record that the execution team proceeded with the administration of pancuronium bromide or potassium chloride before ensuring that the inmate was unconscious.

suffice to demonstrate a substantial risk of serious harm. *See id.* at 1531 ("[A]n isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" (citation omitted)); *see also, e.g., Cooey v. Strickland,* 589 F.3d 210, 224 (6th Cir.2009) ("Speculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional."), *reh'g and reh'g en banc denied,* 588 F.3d 1124 (6th Cir. 2009), *cert. denied and application for stay of execution denied sub nom. Biros v. Strickland,* — U.S. —, 130 S.Ct. 826, 175 L.Ed.2d 580 (2009); *Clemons v. Crawford,* 585 F.3d 1119, 1127 (8th Cir.2009) ("We reject the prisoners' attempt to distinguish their case from *Baze* on the basis of alleged past incompetence on the part of Missouri's medical personnel."); *Emmett v. Johnson,* 532 F.3d 291, 307 (4th Cir. 2008) ("[H]aving reviewed the evidence regarding these [prior] 'errors' in the execution process, we believe that these isolated incidents are insufficient to demonstrate a substantial risk of future harm to Emmett necessary to establish an Eighth Amendment violation."); *Schwab v. State,* 995 So.2d 922, 926–28 (Fla.2008) (per curiam) (rejecting an Eighth Amendment challenge to Florida's lethal injection procedure based in part on examples of past mistakes). Similarly, *Baze* also made clear that "the Constitution does not demand the avoidance of all risk of pain in carrying out executions" because "[s]ome risk of pain is inherent in any method of execution ... *if only from the prospect of error in following the required procedure.*" 128 S.Ct. at 1529 (emphasis added). Clearly, any blunder committed during Steckel's execution does not suffice to show a substantial risk of serious harm in future exe-

cutions. *Cf. Taylor v. Crawford,* 487 F.3d 1072, 1080 (8th Cir.2007) ("If [a] protocol as written involves no inherent substantial risk of the wanton infliction of pain, any risk that the procedure will not work as designated in the protocol is merely a risk of accident, *which is insignificant in our constitutional analysis.*" (emphasis added and citation omitted)); *Workman v. Bredesen,* 486 F.3d 896, 908 (6th Cir.2007) ("At some level, every execution procedure ever used contains risk that the individual's death will not be entirely pain free." (citations omitted)); *Beardslee v. Woodford,* 395 F.3d 1064, 1075 (9th Cir.2005) ("Obviously, there are risks involved in virtually every method of execution. However, the Supreme Court has rejected Eighth Amendment challenges based on an unforeseeable accident[.]" (internal quotation marks and citations omitted)).

The other evidence of Delaware's noncompliance with its protocol is likewise unavailing. The Plaintiffs point to Delaware's failure to maintain written records of the executions; to verify that the equipment used during the executions was in good working order; to undergo the training exercises mandated by the protocol; and to ensure that members of the IV team were shown the portion of the protocol relevant to their responsibilities. (App. 156–60, 169–71, 179.) The Plaintiffs have made no effort, however, to demonstrate how any of these deficiencies, standing either alone or together, poses a substantial risk of serious harm. The Plaintiffs in essence ask us to infer that inmates have experienced pain during previous executions based on Delaware's admittedly often casual approach to the implementation of certain aspects of its former protocol. That invitation must be declined, as we cannot, in this posture, make inferences based on pure supposition. *See Acumed LLC v. Advanced Surgical Servs.,* 561

F.3d 199, 228 (3d Cir.2009) ("[S]peculation and conjecture may not defeat a motion for summary judgment." (citation omitted)). Of course, we do not reject the likelihood that an improperly-trained execution team would be more inclined to make a mistake than a well-trained team. It is just as plausible that faulty equipment could upset an otherwise smoothly-run execution. None of these possibilities, however, even obliquely suggest the existence of conditions that are "sure or very likely to cause serious illness and needless suffering" or "give rise to sufficiently imminent dangers." *Baze,* 128 S.Ct. at 1531 (internal quotation marks, emphasis and citation omitted).

At their core, the various instances of Delaware's noncompliance with its former protocol that the Plaintiffs have presented to us in an effort to meet their summary judgment burden are but a string of isolated examples of maladministration. Significantly, *Baze* explicitly dismissed similar efforts by the petitioners in that case: "The risks of maladministration [the petitioners] have suggested—such as improper mixing of chemicals and improper setting of IVs by trained and experienced personnel—*cannot remotely be characterized as 'objectively intolerable.'* " 128 S.Ct. at 1537 (emphasis added). The Plaintiffs' proffer in this vein is materially indistinguishable from that of the *Baze* petitioners, and thus does not help them meet their burden.

### 2. Lack of a Backup Plan

▮ The Plaintiffs also maintain that Delaware's protocol violates the Eighth Amendment because it lacks what the Plaintiffs refer to as a "Plan B." (Appellants' Op. Br. 48.) Specifically, they point to the deposition of Delaware's expert anesthesiologist, who testified that peripheral IV access would be unobtainable in certain cases. That expert further testified that Delaware's protocol should include a contingency plan in the event the backup IV line cannot be established after an attempt at establishing the primary IV line fails. This argument cannot surmount the wall erected by *Baze* for at least two reasons. First, there is no evidence that the Kentucky protocol examined in *Baze* had a contingency plan in place in the event its written protocol could not be put into effect. The absence of such a plan did not prevent seven Members of the Court from giving that protocol a passing grade on the constitutional test. Indeed, the Plaintiffs acknowledge as much in their brief. (*See* Appellants' Reply Br. 12 ("[T]he Supreme Court approved Kentucky's protocol, which does not have such a plan.").) Second, *Baze* dictates that the Plaintiffs show not only a substantial risk of serious harm, but also that "the conditions presenting the risk are *sure or very likely* to cause serious illness and needless suffering, and give rise to sufficiently *imminent* dangers." 128 S.Ct. at 1530–31 (internal quotation marks and citation omitted). The Plaintiffs' evidence on this point is practically nonexistent. They assert that they were denied the ability to inquire about what Delaware will do if the backup IV line cannot be established. But there is no indication in the record that the District Court imposed such a limitation. Instead, the District Court barred the Plaintiffs from asking Delaware officials about their motives in adopting a new protocol and their intent to follow it. Clearly, by speculating about what those officials might do in what the record intimates to be the very unlikely hypothetical scenario in which the backup IV line cannot be established, the Plaintiffs have failed to show the degree of imminence *Baze* requires. *Cf. Torretti v. Main Line Hosps., Inc.,* 580 F.3d 168, 179 n. 16 (3d Cir.2009) ("[S]peculation alone, without more, is insufficient to survive summary judgment."); *Lexington Ins. Co.*

*v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir.2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quotation marks and citation omitted)). Accordingly, like the *Baze* Court, we conclude that the absence of a backup plan in Delaware's protocol does not bear on our constitutional calculation.

### 3. Existence of a One–Drug Protocol

In their supplemental filings, the Plaintiffs ascribe great weight to Ohio's recent substitution of a three-drug protocol with a one-drug protocol. Ohio made the switch in November 2009 after experiencing what the Sixth Circuit has called "serious and troubling difficulties in executing at least three inmates [under the old protocol.]" *Reynolds v. Strickland*, 583 F.3d 956, 957 (6th Cir.2009). The Plaintiffs' interest in lethal injection developments in Ohio is premised on their apparent belief that evidence of Ohio's missteps in the implementation of its former protocol, and the consequences of those missteps for that state's inmates, proves that Delaware inmates will suffer a similar fate. But the Plaintiffs again ignore *Baze's* teaching that risks of maladministration and mere mistakes do not suffice to prevail on an Eighth Amendment challenge. We are no more persuaded by the Plaintiffs' related argument that Delaware's deliberate indifference is evidenced by its "on-going failure to come to terms with this foreseeable event [i.e., a slip-up akin to the ones committed in Ohio under its former three-drug protocol.]" (Appellants' Supp. Br. 10.) That argument again presumes that the "deliberate indifference" standards employed in conditions-of-confinement cases also govern method-of-execution cases, a presumption we have already determined to be misguided. The Plaintiffs also appear to be operating under the flawed impression that a state may be compelled to change its lethal injection protocol simply because another state has elected to do so. No relevant legal authority supports that impression, which, in our view, runs wholly counter to well-settled notions of federalism and state sovereignty.[18] *Cf. Baze*, 128 S.Ct. at 1531 (rejecting an approach that would "transform courts into boards of inquiry charged with determining 'best practices' for executions"); *id.* at 1527 n. 1 (describing the several states' individual approaches to capital punishment).

In essence, the Plaintiffs claim that Delaware's protocol violates the Eighth Amendment because of the existence of a

---

18. In their supplemental filings, the Plaintiffs also assert, as they did in their initial brief, that a genuine factual dispute exists by virtue of the Delaware protocol's lack of a "Plan B." This time, however, they highlight a similar lack in Ohio's old protocol, which they claim resulted in more than two hours of failed efforts to establish an IV line during the would-be execution of an Ohio inmate. In their view, Delaware could at any time go "off-protocol" in the event of a failure to establish an IV line during an execution. That view is singularly unconvincing. Delaware has a protocol firmly in place. There is nothing in the record to support the proposition, and no logical reason to assume, that Delaware will do anything other than what its protocol requires and what it has represented on the record it would do in the event of a failed administration of sodium thiopental. There is perhaps always an ethereal risk that a rogue execution team could deviate from a written protocol and depart on a whimsical frolic, a possibility the Plaintiffs appear to take as a given. There is no historical basis for such an eventuality, however, as nothing in the record suggests that Delaware officials have ever gone "off-protocol" during any of the thirteen executions already carried out in that state. In any event, such an occurrence is both grossly speculative and highly improbable and thus does not imply the existence of conditions that are "sure or very likely" to cause pain.

purportedly better alternative: a one-drug protocol that would eliminate the potential hazards sometimes occasioned by the maladministration of sodium thiopental. The critical weakness in that position is that it is remarkably similar, if not identical, to the one advanced by the *Baze* petitioners and specifically rejected by the *Baze* Court. *See* 128 S.Ct. at 1531 (noting that "[s]uch an approach finds no support in our cases, would embroil the courts in ongoing scientific controversies beyond their expertise, and would substantially intrude on the role of state legislatures in implementing their execution procedures"). *Baze* explained that an inmate seeking to establish an Eighth Amendment violation based on the existence of an alternative must prove that the alternative is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* at 1532. The Plaintiffs have not carried that burden because they have submitted no evidence on this point. Instead, they have merely directed our attention to another state that has adopted the protocol the Plaintiffs wish to see implemented in Delaware. Under *Baze*, that line of attack simply does not carry the day. *See id.* at 1537 ("[A]n inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures."); *see also, e.g., Cooey*, 589 F.3d at 228 (rejecting an inmate's "proposed amendment to Ohio's protocol [a]s eminently the kind of cost-benefit judgment that courts are ill-suited to perform and that *Baze* discouraged" (citing *Baze*, 128 S.Ct. at 1531)).

In sum, on this record we are compelled to conclude that the Plaintiffs have failed to show that Delaware's lethal injection protocol violates the Eight Amendment under *Baze*. Accordingly, we will affirm the District Court's grant of summary judgment for Delaware.

### C. The District Court's Stay

Delaware argues that the District Court erred when it kept in place the stay of Jackson's execution that it entered shortly after these proceedings began. In essence, the District Court granted a stay pending appeal, and appears to have done so *sua sponte*, as there is no clue in the record that any party asked for such relief. Because we will affirm the District Court's grant of summary judgment for Delaware, we will dissolve the District Court's stay and therefore have no occasion to reach the merits of Delaware's cross-appeal.

We cannot leave this issue, however, without saying a word about the District Court's decision not to provide any reasons for granting a stay pending appeal. In its order granting summary judgment for Delaware, the District Court stated only that "the stay entered on May 6, 2006, shall remain in effect pending appeal." (App.59.) Under the circumstances presented here, we are not hard-pressed to divine potential reasons for the District Court's decision to prolong the stay. The District Court might have thought there was a reasonable likelihood that the Plaintiffs would prevail on appeal. In light of that perceived likelihood, the District Court might have considered the possibility of irreparable harm to Jackson were he executed under an unconstitutional protocol. Both of these reasons might well be valid. But we are reluctant to rely purely on our own speculation, no matter how logically appealing or supported by a piecemeal gathering of elements in the record, in reviewing a district court's grant of a stay pending appeal, or any other relief for that matter.

█ Explicit, on-the-record reasons for granting any relief, including a stay pending appeal, not only facilitate, but are often

crucial to, effective appellate review. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ("It is essential ... that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law."). Indeed, the omission of such reasons makes our role as a reviewing court needlessly arduous, and sometimes even practically impossible. *See Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 295 (3d Cir.1991) (noting "the difficulties posed by a district court's ruling without explanation"); *see, e.g., Educ. Testing Servs. v. Katzman,* 793 F.2d 533, 546 (3d Cir.1986) (finding "meaningful appellate review of the [district court's] conclusions impossible without ... specific findings of fact"). Accordingly, we encourage district courts in this circuit to state their reasons for granting stays pending appeal so that we can clearly understand the factual and legal predicates giving rise to such relief.

## IV. CONCLUSION

The safeguards drafted into Delaware's new lethal injection protocol exceed those contained in the Kentucky protocol that seven Justices in *Baze* found constitutionally firm, and the Plaintiffs have failed to adduce evidence that the new protocol otherwise offends the Eighth Amendment. Accordingly, we will affirm the District Court's grant of summary judgment for Delaware and dissolve the District Court's stay. Our holding, of course, should in no way be construed as license for Delaware to stay the worrisome course it appears to have taken at times under its former protocol. As *Baze* aptly noted, "[r]easonable people of good faith disagree on the moral-

ity and efficacy of capital punishment[.]" 128 S.Ct. at 1537. But whatever one's personal feelings about the death penalty, no reasonable person disputes that the execution of a human being, no matter how heinous his or her crime, is a most solemn and weighty matter. The record before us reflects an occasional blitheness on Delaware's part that, while perhaps not unconstitutional, gives us great pause. We remind Delaware not only of its constitutional obligation to ensure that the implementation of its new protocol does not run afoul of the Eighth Amendment's proscription of cruel and unusual punishment, but also of its moral obligation to carry out executions with the degree of seriousness and respect that the state-administered termination of human life demands.