**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY SCOTT DICKENS; DONALD
EDWARD BEATY; CHARLES M.
HEDLUND; ROBERT WAYNE
MURRAY; THEODORE WASHINGTON;
TODD SMITH,
              *Plaintiffs-Appellants,*

              v.

JANICE K. BREWER; CARSON
MCWILLIAMS, Warden, ASPF;
ROBERT STEWART, Warden,
ASPCE; UNKNOWN EXECUTIONERS,
in their official capacities as
Employees, Contractors and/or
Agents of the ADC; CHARLES L.
RYAN,
              *Defendants-Appellees.*

No. 09-16539

D.C. No.
2:07-cv-01770-
NVW

OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
December 10, 2010—San Francisco, California

Filed February 9, 2011

Before: Procter Hug, Jr., Dorothy W. Nelson, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge McKeown

## COUNSEL

Steven A. Rosenstein and Allen W. Burton, O'Melveny & Myers LLP, New York, NY; John M. Sands, Robin C. Konrad and Dale A. Baich, Federal Public Defenders, Pheonix, Arizona, for the plaintiffs-appellants.

Kent E. K Cattani and Jeffrey A. Zick, U.S. Attorney's Office, Pheoniz, Arizona, for the defendant-appellees.

## OPINION

McKEOWN, Circuit Judge:

### I.  INTRODUCTION

Like most states that impose the death penalty, Arizona uses a three-drug lethal injection protocol. Under the protocol, executions are carried out through the sequential administration of three chemicals—sodium thiopental, pancuronium bromide and potassium chloride. The problems that can arise

from the use of such a protocol are well known: if the sodium thiopental is not administered correctly, the inmate will be improperly anesthetized during the execution and will experience tremendous pain and suffering from the administration of the pancuronium bromide and potassium chloride. Arizona's protocol contains a number of safeguards intended to ensure proper anesthetization. In this appeal, we are asked to decide whether, despite these safeguards, Arizona's protocol creates an unconstitutional risk that an inmate will be improperly anesthetized and thus experience extreme pain and suffering while dying.

The appellants—Gregory Dickens, Donald Edward Beaty, Charles M. Hedlund, Michael Emerson Correll, Robert Wayne Murray, Theodore Washington, and Todd Smith (referred to collectively as "Dickens")—are death row inmates in Arizona. In 2007, Dickens brought an action under 42 U.S.C. § 1983, asserting that Arizona's execution protocol violates the Eighth Amendment because of the risk of improper anesthetization. The district court granted summary judgment in favor of Arizona, holding that the protocol contains sufficient safeguards to protect against improper anesthetization and thus is constitutional under the standard set forth by the three-Justice plurality in *Baze v. Rees*, 553 U.S. 35 (2008)—not giving rise to a "substantial risk of serious harm" and not "sure or very likely to cause" serious pain and suffering.

On appeal, the heart of Dickens's argument is *not* that the safeguards in Arizona's protocol are inadequate. Dickens does argue that Arizona should be required to adopt some additional safeguards. His central assertion, however, is that evidence gathered during discovery raises issues of fact as to whether Arizona will follow the protocol and ensure that the existing safeguards are properly implemented. Because the protocol's safeguards are adequate under the *Baze* standard and because there is no material issue of fact regarding compliance with the protocol, we affirm.

## II.  BACKGROUND

### A.  LETHAL INJECTION IN ARIZONA

Arizona has mandated execution by lethal injection since 1992.[1] From 1992 to 2000, Arizona executed twenty inmates. Then there was a six- year hiatus—Arizona did not conduct any executions from 2000 to 2006. In 2007, Arizona executed one inmate, Robert Comer, on May 22, 2007.

Arizona uses a three-drug lethal injection cocktail that consists of three chemicals—sodium thiopental, pancuronium bromide and potassium chloride—administered sequentially. Sodium thiopental is a fast-acting barbiturate that anesthetizes the inmate and permits the other chemicals to be administered without causing pain. Pancuronium bromide is a paralytic neuromuscular blocking agent that causes complete paralyzation and suffocation. Potassium chloride induces cardiac arrest. It is uncontested on this record that, if an inmate is not properly anesthetized by the sodium thiopental at the start of the execution, he will experience significant pain and suffering from the administration of the pancuronium bromide and potassium chloride. If the sodium thiopental is administered properly, however, there is no risk of pain during the execution.

Until 2007, Arizona did not have any written procedures for preparing and administering the lethal injection chemicals. Execution procedures were maintained solely "through practical exercises and training." In the months leading up to Comer's execution in May 2007, Arizona began revising its execution procedures and drafting a written execution protocol. After Comer's execution, Arizona further revised the procedures, eventually producing a written protocol dated November 1, 2007.

---

[1]Inmates sentenced to death prior to November 23, 1992 may choose between execution by lethal injection or by lethal gas. Absent an election, lethal injection is used.

During the course of this litigation, Arizona agreed to amend the November 1, 2007 protocol to address some concerns raised by Dickens. Among other amendments, Arizona agreed to conduct license and background checks on all members of the medical team that assists with executions, and to no longer employ certain medical team members who Dickens argued were incompetent. Arizona also added training and experience requirements for medical team members. The amendments are set forth in a Joint Report submitted to the district court on April 9, 2009.

The district court considered the constitutionality of the November 1, 2007 protocol, as amended by the Joint Report (the "Protocol"), and our analysis on appeal is similarly constrained. We have not considered—and express no opinion on—any amendments to the Protocol or any provisions that were not addressed by the district court.[2]

## B. ARIZONA'S LETHAL INJECTION PROTOCOL

Under the Protocol, an execution is carried out by two teams—the Special Operations Team ("SOT") and the Medical Team. SOT's primary duty is to administer the chemicals. It consists of at least seven medically trained individuals and a team leader; all members must undergo a screening panel and individual interview prior to joining SOT. SOT members must participate in at least ten execution rehearsals per year, and, if a Warrant of Execution issues, train weekly up until the execution.

The Medical Team, which has at least two members, is responsible for inserting the intravenous (IV) catheters

---

[2]Arizona never provided the district court with an integrated copy of the Protocol (the November 1, 2007 protocol as amended by the Joint Report). On appeal, we directed Arizona to submit a copy of the Protocol. The version of the protocol that Arizona submitted, however, contains several provisions that were not before the district court.

through which the chemicals are injected, preparing the chemicals and supervising their administration, and monitoring the inmate. Members of the Medical Team ("MTMs") must be medically trained personnel, such as physicians, physician assistants, nurses, or emergency medical technicians; they must have at least one year of current and relevant professional experience in their assigned duties. MTMs's professional qualifications, training, experience, professional licenses and certifications are checked prior to hiring. Licensing and criminal history reviews are conducted before hiring, annually and upon the issuance of a Warrant of Execution. The MTMs responsible for inserting the IVs and any MTMs without medical licenses must participate in at least ten rehearsals per year with SOT. All MTMs must participate in at least two rehearsals prior to participating in an actual execution.

According to the Protocol, the chemicals must be administered through IV catheters inserted in the inmate's peripheral veins. The MTMs who place the peripheral lines must have at least one year of current and regular experience with the procedure. If it is not possible to place peripheral lines, an MTM can place a percutaneous central line in the femoral vein in the inmate's thigh. The MTM who places the central line must have at least one year of current and regular experience with the procedure.

The MTMs and the SOT Leader directly observe the inmate throughout the administration of the chemicals, and monitor the inmate's face with a high-resolution, color video camera. A microphone is attached to the inmate's chest so that the teams can speak to and hear the inmate during the execution. The warden remains in the execution chamber throughout the procedure to observe the IV lines and notify the MTMs of any problems.

After the sodium thiopental is administered, the MTMs confirm that the inmate is unconscious by "sight and sound"

using the camera and microphone, and an MTM enters the execution chamber to physically confirm unconsciousness. If the inmate is conscious, the Director of the Arizona Department of Corrections may order the SOT members to administer an additional dose of sodium thiopental, and the MTMs go through the same steps to verify unconsciousness. The SOT members cannot administer the pancuronium bromide until the MTMs have confirmed that the inmate is unconscious and at least three minutes have elapsed from the commencement of the administration of the sodium thiopental. The IV lines are flushed with heparin/saline between each injection, to ensure that they are clean and functioning properly.

## C. DISTRICT COURT PROCEEDINGS

In his original complaint filed in 2007, Dickens asserted that the Protocol carries an unconstitutional risk of inflicting extreme pain and suffering because it does not adequately protect against the risk that he will be insufficiently anesthetized prior to administration of the pancuronium bromide and potassium chloride.

In 2008, while Dickens's suit was in the discovery phase, the United States Supreme Court issued its decision in *Baze*, in which a plurality held that Kentucky's lethal injection protocol is constitutional because it does not carry a "substantial risk of serious harm." *Id.* at 49-50 (internal quotation and citation omitted). Following the *Baze* decision, Arizona moved for summary judgment, arguing that the Protocol is similar to the Kentucy protocol and thus constitutional under the substantial risk standard. Arizona also agreed to the amendments discussed above.[3]

---

[3]Specifically, the five amendments agreed to in the Joint Report are: (1) The default means for administering the chemicals will be peripheral IV lines, rather than a central line to the femoral vein, and the peripheral lines will be placed by individuals with at least one year of current and relevant experience with the procedure; (2) a false line—a second IV line that emp-

In opposition to Arizona's motion, Dickens argued that the Protocol's safeguards are inadequate, and that questions of fact remained as to whether Arizona would follow the Protocol when carrying out an execution. Dickens also posited that Arizona should be required to adopt a one-drug protocol, consisting of one, very large dose of sodium thiopental, which guarantees death without the risk of pain and suffering.

The district court granted Arizona's motion for summary judgment. The court held that the Protocol, which included the amended procedures, provides the same or greater protection than Kentucky's protocol and thus does not create a substantial risk of serious harm in violation of the Eighth Amendment.

## III.   ANALYSIS

### A.   THE *BAZE* STANDARD

**[1]** In *Baze*, the Supreme Court held that Kentucky's three-drug lethal injection protocol does not violate the Eighth Amendment. The Justices, however, were not unanimous in the rationale for their decision. Seven Justices issued four opinions upholding the protocol, while two dissented. Chief Justice Roberts authored the plurality opinion, which was joined by Justices Kennedy and Alito. The plurality held that the Kentucky protocol is constitutional because it contains

---

ties into a bucket—will not be used; (3) the clinical concentration of sodium thiopental will be 2.5%; (4) Arizona will conduct licensing and background checks on all MTMs prior to participation in an execution, annually after contracting, and upon issuance of a Warrant of Execution; and (5) two individuals previously hired for the Medical Team—Dr. Alan Doerhoff and an individual known as MTM #3—will not participate in any future executions in Arizona. Arizona also added the requirements that all MTMs participate in at least two trainings prior to participating in an execution, and that MTMs have at least one year of current and relevant professional experience.

sufficient safeguards to prevent improper anesthetization, and thus does not give rise to a "substantial risk of serious harm" and is not "sure or very likely to cause" serious pain and suffering. *Baze*, 553 U.S. at 49-50. Justice Thomas, joined by Justice Scalia, concurred in the judgment but stated that an execution protocol is unconstitutional only if it is "deliberately designed to inflict pain," which Kentucky's protocol is not. *Id.* at 94.

Justice Stevens also concurred in the judgment, but did not articulate a standard for assessing the protocol's constitutionality. Rather, Justice Stevens expressed his belief that the death penalty is unjustified, but stated that he was bound by the Court's existing framework for evaluating the protocol's constitutionality. *Id.* at 78-87. Under that framework and on the basis of the evidence before him, Justice Stevens concluded that Kentucky's protocol did not violate the Eighth Amendment. *Id.* at 87.

Justice Breyer concurred in the judgment but adopted the standard articulated by Justice Ginsburg in her dissent: a method of execution is unconstitutional if it poses an untoward, readily avoidable risk of inflicting severe and unnecessary pain. *Id.* at 107. Justice Breyer found that the evidence did not establish that the Kentucky protocol posed such a risk. *Id.* Justices Ginsburg and Souter dissented on the ground that the case should be remanded to the district court for further consideration of whether the safeguards prevented an unnecessary risk of pain. *Id.* at 114.

Faced with the Justices's divergent views, we turn to the Supreme Court's decision in *Marks v. United States*, 430 U.S. 188 (1977), for guidance. In *Marks*, the Court explained that when it issues a "fragmented" decision," the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* at 193. When applying the *Marks* rule, we look for " 'a legal standard which, when applied, will necessarily produce

results with which a majority of [the Justices] from that case would agree.' " *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006) (quoting *Planned Parenthood v. Casey*, 947 F.2d 682, 693 (3d Cir. 1991)). Where the Justices issue three or more opinions, the "narrowest grounds" principle identifies as authoritative "the opinion of the Justice or Justices who concurred on the narrowest grounds *necessary to secure a majority.*" *See Casey*, 947 F.2d at 694 n.7.

Dickens argues that we should follow Justice Stevens's opinion because he concurred on the narrowest grounds—the facts of the case and existing precedent. This approach misapprehends the *Marks* rule. Justice Stevens's concurrence is not the narrowest concurrence *necessary to secure a majority*. This honor belongs to the plurality. If an execution protocol is found constitutional under the plurality's substantial risk standard, Justices Thomas and Scalia will concur in the judgment, because their standard for constitutionality is broader—a protocol that does not present a substantial risk of serious pain likely is not deliberately designed to inflict such pain. If the protocol is found *un*constitutional under the plurality's standard, then Justices Breyer, Ginsburg, Souter, and likely Stevens would concur in the judgment because their standards for constitutionality are narrower—a protocol that presents a substantial risk of serious pain likely also presents an unnecessary risk of serious pain. The plurality's standard, therefore, is the narrowest necessary to secure a majority in any given challenge to a method of execution.

**[2]** Every circuit court that has considered a challenge to a lethal injection protocol following *Baze* has analyzed the protocol under the plurality's substantial risk standard. *See Raby v. Livingston*, 600 F.3d 552, 557 (5th Cir. 2010); *Nooner v. Norris*, 594 F.3d 592, 598-99 (8th Cir. 2010); *Jackson v. Danberg*, 594 F.3d 210, 219-22 (3d Cir. 2010) (finding the plurality's opinion controlling under the *Marks* rule); *Cooey v. Strickland*, 589 F.3d 210, 220 (6th Cir. 2009); *Clemons v. Crawford*, 585 F.3d 1119, 1125-26 (8th Cir. 2009);

*Harbison v. Little*, 571 F.3d 531, 535 (6th Cir. 2009); *Emmett v. Johnson*, 532 F.3d 291, 298 (4th Cir. 2008); *see also Morales v. Cate*, 623 F.3d 828, 829 (9th Cir. 2010) (noting that whether California's lethal injection protocol is constitutional depends on whether it creates a "substantial risk of serious harm"). In October 2010, the Supreme Court itself applied the plurality's standard when vacating a temporary restraining order barring an execution in Arizona because the sodium thiopental to be used had been obtained from a foreign source. *See Brewer v. Landrigan*, 131 S. Ct. 445 (2010). Citing the *Baze* plurality, the Court held that the execution could proceed because there was no evidence that the drug was " 'sure or very likely to cause serious illness and needless suffering.' " *Id.* (*citing Baze*, 553 U.S. at 50) (emphasis omitted). We are, therefore, in good company in holding that the *Baze* plurality's substantial risk standard is the controlling standard for assessing the constitutionality of an execution protocol.

## B.   Constitutionality of the Protocol

We next turn to Dickens's argument that questions of fact remain as to the Protocol's constitutionality, even under the substantial risk standard. We begin by noting what Dickens is *not* arguing: by and large, Dickens is not arguing that the Protocol's safeguards are inadequate. Although Dickens urges that Arizona should be required to adopt some additional safeguards, the heart of his argument is that questions of fact remain as to whether Arizona will *follow* the Protocol and ensure that its existing safeguards are implemented properly. Dickens claims that evidence obtained during discovery suggests that Arizona is incapable of—or not interested in—hiring competent individuals to serve on the execution teams and adhering to the Protocol's procedures during an execution. If Arizona does not follow the Protocol, Dickens contends, there is a substantial risk that he will be inadequately anesthetized when the pancuronium bromide and potassium chloride are administered.

*Baze* does not foreclose Dickens's argument. *Baze* creates a safe harbor for lethal injection protocols that are substantially similar to Kentucky's protocol; the plurality states that such protocols do not create a substantial risk of serious harm. *Id.* at 61. Arizona's Protocol falls within this safe harbor—it incorporates even more safeguards against maladministration than Kentucky's protocol, including requirements that the Medical Team monitor the inmate with a microphone and camera and physically confirm unconsciousness. *See Baze*, 533 U.S. at 55 (describing the safeguards in the Kentucky protocol). Dickens, however, asks us to look beyond the Protocol's facial constitutionality to consider whether there is a substantial risk that it will be implemented in an unconstitutional manner. In *Baze*, the plurality specifically stated that there was no evidence of improper implementation of Kentucky's protocol. *Id.* at 46. Dickens asserts that there is such evidence here, and we must evaluate the Protocol in light of Dickens's evidence. This is an important inquiry. If a court could never look beyond the facial constitutionality of an execution protocol when presented with evidence of improper administration, states could simply adopt constitutionally sufficient protocols similar to Kentucky's and then flout them without fear of repercussion.

**[3]** Nonetheless, to succeed on his argument, Dickens faces an uphill battle. Most of the evidence Dickens cites comes from events occurring before Arizona adopted the Protocol and its safeguards. For the evidence to affect our analysis, Dickens must raise issues of fact as to whether there is a substantial risk that he will be improperly anesthetized *despite* the Protocol's safeguards, including those added through amendment. *See*, *Baze* 553 U.S. at 56 ("In light of [the protocol's] safeguards, we cannot say that the risks identified by petitioner are so substantial or imminent as to amount to an Eighth Amendment violation."). In addition, the evidence must show more than a single accident or mistake or failure to follow the Protocol. Although we do not discount in any way a singular violation or mistake, *Baze* held that "an iso-

lated mishap alone . . . while regrettable, does not . . . give rise to a substantial risk of serious harm." *Id.* at 50 (internal quotations and citations omitted).

Overcoming these evidentiary hurdles is not an impossible task, but it is a difficult one. *See id.* at 53 (plaintiffs must meet the "heavy burden of showing that Kentucky's procedure is cruelly inhumane") (internal quotations and citation omitted). Indeed, since *Baze*, every circuit court that has considered a challenge to a lethal injection protocol has upheld the challenged protocol, despite evidence of past problems carrying out executions. *See Raby*, 600 F.3d at 558-61 (evidence of problems with inserting IVs and monitoring); *Nooner*, 594 F.3d at 601, 608 (evidence that inmates may have been conscious during second injection); *Jackson*, 594 F.3d at 212-13, 229 (evidence that wrong amounts of chemicals were administered and that personnel did not check equipment and attend training); *Cooey*, 589 F.3d at 217-18, 224, 233-34 (evidence of problems inserting IV); *Clemons*, 585 F.3d at 1125, 1128 (past employment of incompetent medical team personnel); *Harbison*, 571 F.3d at 537, 539 (evidence of hiring personnel with drug and mental health problems, and insufficient training); *Emmett*, 532 F.3d at 303, 306-08 (evidence of inadequate doses of sodium thiopental and problems with IV lines).

### 1.   Competence of Execution Team Members

Dickens argues that past missteps in hiring and training raise an issue of fact as to whether Arizona will hire competent team members in the future. The evidence Dickens points to is Arizona's hiring of two unqualified MTMs—Dr. Alan Doerhoff and an individual known as MTM #3—and its failure to interview and screen a current member of the SOT and an MTM known as MTM #1. Arizona hired Doerhoff to serve on the Medical Team for the Comer execution in May 2007. Doerhoff is a physician and licensed surgeon who lives in Missouri; he has assisted with executions in several states and for the federal government. At the time Arizona hired Doerh-

off, he had testified in a case challenging Missouri's execution protocol that he is dyslexic, has problems with numbers, knowingly "improvised" the doses of lethal injection drugs, adhered to no set protocol, and kept no records of procedures. Following Doerhoff's testimony, Missouri publicly announced that it would no longer use him in executions.

Arizona hired MTM #3 in February 2008. During discovery, Dickens learned that MTM #3 did not attend medical school, had his nursing license suspended, and did not have any other medical licenses. When he was hired for the Medical Team, MTM #3 owned an appliance business. He has been treated for post-traumatic stress disorder from service in Iraq, and has been arrested multiple times. As one of the amendments to the November 1, 2007 protocol, Arizona agreed never to use Doerhoff or MTM #3 in future executions.

**[4]** We do not question the challenges to Doerhoff and MTM #3, nor do we reject the claim that a Medical Team made up of individuals like them could undermine the Protocol. At the time that Doerhoff and MTM #3 were hired, however, there were neither formal experience and training requirements nor routine background and license checks on MTMs. These requirements are all amendments to the November 1, 2007 protocol that were adopted through the Joint Report. It is undisputed that neither Doerhoff nor MTM #3 would have been hired under the current Protocol. But the fact that Arizona hired unqualified MTMs before the Protocol was in place does not create an issue of fact as to whether Arizona will do the same when operating under the Protocol.[4] *See*

---

[4]At her deposition—taken before the protocol was amended to add the background check requirement—the former Director of the Arizona Department of Corrections, Dora B. Schriro, stated that Arizona conducted background checks on potential MTMs. Dickens argues that Arizona failed to follow this procedure when it hired Doerhoff and MTM #3, and thus that there is a question of fact as to whether Arizona will conduct the

*Raby*, 600 F.3d at 560 (evidence of past failure to follow protocol did not "rise to the level of constitutional significance" because "the Execution Procedure mandates . . . that sufficient safeguards are in place to reduce the risk of pain below the level of constitutional significance"); *Jackson*, 594 F.3d at 226 (evidence of failure to follow former procedures does not "suggest the existence of conditions that are sure or very likely to cause serious illness and needless suffering") (internal citation and quotation omitted); *Clemons*, 585 F.3d at 1128 ("The mere allegation Missouri employed [Doerhoff] in the past simply does not support the prisoners' allegations Missouri will employ 'incompetent' and 'unqualified' personnel in the future.").

**[5]** During discovery, Dickens also learned that Arizona failed to interview and screen MTM #1 and a current member of the SOT. When MTM #1 was hired in 2007, there were no interview or screening requirements for MTMs. Arizona was required to interview and screen the SOT member, and it failed to do so. One, isolated failure to follow a procedure does not create an "objectively intolerable risk of harm," particularly where there is no evidence that the SOT member is unqualified for his job or that any problems have arisen from his participation on SOT. *See Baze*, 553 U.S. at 50 ("[A]n isolated mishap alone . . . while regrettable, does not suggest . . . a substantial risk of serious harm.") (internal quotation and citation omitted); *Raby*, 600 F.3d at 560 (possibility that warden had not screened execution team members did not raise

---

checks in the future. At the time the two were hired, however, there was no formal, written requirement that Arizona conduct licensing and background checks. The fact that Arizona failed to follow an informal, unwritten policy when it hired Doerhoff and MTM #3 does not raise a question of fact as to whether Arizona will follow a formal, written policy in the future.

issue of fact where no evidence that the team members lacked required qualifications).[5]

## 2.   Implementation of Execution Procedures

Dickens also contends that there were problems with administering the chemicals during Comer's execution. The records from Comer's execution indicate that the chemicals were administered more quickly than planned. The checklist setting forth each step of the execution states that the administration of the sodium thiopental should take approximately two minutes and forty-five seconds. The execution records, however, reflect that it took less than two minutes to administer. In addition, the SOT members administering the chemicals did not flush the line with heparin/saline between two of the injections. MTM #1 caught the error before the second injection and instructed the SOT members to flush the line.

[6] Although we agree with Dickens that it is critical for Arizona to follow the procedures set forth in the Protocol when conducting an execution, the evidence from Comer's execution—undertaken before the Protocol was in place—is insufficient to cast doubt on Arizona's ability or willingness to do so. Even construing the evidence in the light most favorable to Dickens, there is no indication that Arizona failed to follow the procedures in place at the time of the execution. Absent any evidence that Arizona failed to adhere to execution procedures in the past, it would be pure speculation to conclude that Arizona might fail to follow the Protocol in the future or even that a material issue of fact has been raised

---

[5]In January 2009, when the parties filed their appeal briefs, Arizona did not have a complete Medical Team in place. MTM #3 was let go and MTM #1 is deployed overseas with the military. Dickens argues that the incomplete Medical Team makes it impossible to assess whether Arizona is capable of hiring competent MTMs. The Protocol, however, sets forth the standards under which Arizona must hire future MTMs. These standards are adequate and the evidence does not suggest that Arizona will fail to adhere to them in future hiring.

with respect to the effect of past compliance. *See Emmett*, 532 F.3d at 304 ("[S]peculation and building of inferences [of improper administration] . . . is wholly insufficient to create a genuine issue of material fact that Virginia has a history of failing to properly administer full doses of thiopental . . . .").

**[7]** Since Comer's execution, Arizona also has adopted additional safeguards to reduce the risk of improper anesthetization. Team members must undergo extensive training, the MTMs must physically confirm unconsciousness and SOT must wait three minutes before the pancuronium bromide is injected. Even if the evidence suggested that Arizona's past execution procedures created a substantial risk of harm, that evidence, alone, would not establish an issue of fact as to whether such a risk exists under the Protocol. *See Nooner*, 594 F.3d at 602 ("[E]ven if [Arkansas] engaged in a 'series of abortive' execution attempts under previous protocols, the record does not establish a genuine issue of material fact about whether the Inmates will remain conscious . . . under the current protocol.").

Finally, without dismissing the significance of any problems that might have occurred during Comer's execution, we are bound by *Baze* to hold that "an isolated mishap . . . while regrettable, does not suggest . . . a 'substantial risk of serious harm.' " *Baze*, 553 U.S. at 50 (quoting *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 842 (1947) (upholding a second attempt to electrocute a prisoner after the first attempt failed)).

### 3. Other Alleged Inadequacies in the Protocol

Dickens's remaining complaints regarding the adequacy of the Protocol's safeguards are unpersuasive. Dickens argues that Arizona should be required to add three safeguards to the Protocol: a requirement that an MTM have experience monitoring anesthetic depth (the depth of an inmate's unconsciousness following administration of the sodium thiopental); a

requirement that all MTMs be screened for medical and psychological problems; and a requirement that at least one MTM have experience placing a percutaneous central line, in case it is necessary to resort to this back-up procedure during an execution.

**[8]** *Baze* counsels that "an inmate cannot succeed on an Eighth Amendment claim simply by showing one more step the State could take as a failsafe for other, independently adequate measures." *Baze*, 553 U.S. at 60-61. Where an execution protocol contains sufficient safeguards, the risk of not adopting an additional safeguard is too "remote and attenuated" to give rise to a substantial risk of serious harm. *Id.* at 58-59. The Protocol contains more safeguards than the Kentucky protocol and there is no evidence that Arizona will fail to follow it in future executions. Accordingly, the risk that Dickens will be improperly anesthetized if Arizona fails to adopt the additional safeguards is too remote and attenuated to raise questions of fact as to the Protocol's constitutionality. *Id.*; *see also Harbison*, 571 F.3d at 537-38 (failure to require physical consciousness check and evidence of hiring personnel with drug problems and PTSD did not render protocol unconstitutional where there were sufficient safeguards to ensure proper anesthetization); *Nooner*, 594 F.3d at 604 (requirement that alternative central line be placed by licensed physician was sufficient to address risk that unqualified personnel will place line); *Jackson*, 594 F.3d at 227 ("[B]y speculating about what [the] officials might do in what the record intimates to be the very unlikely hypothetical scenario in which the backup IV line cannot be established, the Plaintiffs have failed to show the degree of imminence *Baze* requires.").

Dickens also challenges the Protocol's failure to provide formal procedures for amendment. If Arizona amends the Protocol to modify the current safeguards, Dickens—or another affected death row inmate—may be able to challenge the constitutionality of the amended protocol. The notion that

Arizona might adopt and use a new, unconstitutional protocol can only be dismissed as rank speculation.

## C.   AVAILABILITY OF THE ONE-DRUG PROTOCOL

**[9]** We cannot embrace the claim that the Protocol is unconstitutional because a one-drug approach is a proven alternative. Under *Baze*, the failure to adopt an alternative protocol establishes an Eighth Amendment violation only if the current protocol creates a substantial risk of serious harm that the alternative protocol will reduce. *Baze*, 553 U.S. at 52. "[A] condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative [exists]." *Id.* at 51 (internal quotation and citation omitted). Here, we have determined that the Protocol does not create a substantial risk of serious harm, and thus Arizona cannot be required to adopt a one-drug protocol, even if there is evidence that the protocol is safer and feasible.

**AFFIRMED.**