

**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| PAUL EZRA RHOADES, | No. 11-35940 |
| Petitioner - Appellant, | D.C. No. CV-11-0000445-REB |
| v. | |
| BRENT REINKE, RANDY BLADES, DOES 1–50, and/or UNKNOWN EXECUTIONERS, | OPINION |
| Respondents - Appellees. | |

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Magistrate Judge, Presiding[*]

Submitted, November 16, 2011[**]
San Francisco, California

Before: GOULD, BYBEE, and BEA, Circuit Judges.

Per Curiam:

---

[*] By stipulation of the parties, Magistrate Judge Ronald E. Bush presided over Rhoades's motion.

[**] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

We consider Paul Ezra Rhoades's appeal from the district court's denial of his emergency motion for preliminary injunction or stay of execution. The district court held that the Idaho Department of Correction ("IDOC") has provided appropriate safeguards to ensure that there is not a substantial risk of serious harm to Rhoades in the form of severe pain during the administration of the drugs used in Idaho's three-drug lethal injection protocol; that the safeguards are substantially similar to those contained in execution protocols approved by the Supreme Court and by this court; that the IDOC is not required to implement a different, one-drug protocol in this execution; that Rhoades will suffer irreparable harm in the absence of preliminary relief; that the equities of the case do not require a different result; and that the public interest favors denial of the request for a stay of the execution. We conclude that Rhoades has not shown that he is likely to succeed in his challenge to the protocol. Hence he is not entitled to a stay, and we affirm.

Rhoades is scheduled to be executed by lethal injection by the IDOC on Friday, November 18, 2011. He filed his emergency motion for preliminary injunction or stay of execution in the district court on October 28, 2011. To obtain relief, Rhoades "must demonstrate (1) that he is likely to succeed on the merits of such a claim, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an

injunction is in the public interest." *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Rhoades claims he is entitled to relief. We disagree and explain why we reject his arguments.

We review the district court's denial of Rhoades's emergency motion for preliminary injunction or stay of execution for abuse of discretion. *Beardslee v. Woodford*, 395 F.3d 1064, 1068 (9th Cir. 2005). "Our review is limited and deferential." *Id.* (quoting *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)). "We review underlying legal issues de novo and findings of fact for clear error." *Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 950–51 (9th Cir. 2007).

Death penalty cases are wrenchingly difficult to assess because of the superordinately high stakes for the prisoner whose execution is scheduled and for society which plans to take the prisoner's life as a sanction for the murder of one or more of its citizens. But the key rules that govern this appeal have already been set. The Supreme Court has approved of the death penalty as a continuing option for states that choose to invoke this supreme punishment. *Gregg v. Georgia*, 428 U.S. 153, 168–69 (1976). Many, but not all, states have chosen to maintain the death penalty, including Idaho. The Supreme Court has made clear that this is

permissible if the standards it has invoked are followed. A three-drug execution protocol in Kentucky was approved by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), which signaled that similar procedures would be upheld. Relying on *Baze*, our circuit approved a three-drug execution protocol in Arizona in *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011). We consider *Baze* and *Dickens* to be controlling absent a showing of material difference. These cases might permit us to give preliminary relief if Rhoades made a persuasive case that he has shown a substantial risk of serious harm from the protocol, which is risk of gratuitous pain as contrasted with risk of execution, the object of the protocol. So this appeal in essence comes down to the question whether the procedure Idaho uses is similar to or materially different from the procedures approved in *Baze* and *Dickens*. If its protocol is similar to the approved three-drug protocols, the existence of an alternative one-drug protocol is not dispositive. We turn to Rhoades's contentions.

Rhoades contends that Idaho's lethal injection protocol, Standard Operating Procedure 135.02.01.001 ("SOP 135"), is not substantially similar to the court-approved three-drug lethal injection protocols in *Baze* and *Dickens*. In *Baze*, the Supreme Court considered whether Kentucky's three-drug lethal injection protocol violated the Eighth Amendment's prohibition of cruel and unusual punishment.

The Court concluded that "to prevail on such a claim there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Baze*, 553 U.S. at 50 (internal quotation marks omitted). The Court upheld the Kentucky protocol, which involved the sequential administration of sodium pentothal (also known as sodium thiopental), pancuronium bromide, and potassium chloride, concluding that Kentucky's inclusion of safeguards to ensure the effective administration of the drugs mitigated any substantial risk of serious harm. *Id.* at 56 ("In light of these safeguards, we cannot say that the risks identified by petitioners are so substantial or imminent as to amount to an Eighth Amendment violation.").

In *Dickens*, we addressed the constitutionality of Arizona's three-drug lethal injection protocol. We held that in accordance with the Supreme Court's decision in *Baze*, Arizona's protocol fell within the "safe harbor" of lethal injection protocols that are "substantially similar" to the Kentucky protocol. *Dickens*, 631 F.3d at 1146. SOP 135 was based on, and is nearly identical to, Arizona's lethal

injection protocol. What minor differences do exist are not applicable to the way the protocol is being implemented in this case.[1]

Rhoades's primary contention is that SOP 135 violates the Eighth Amendment because it lacks adequate safeguards. In *Baze*, the Supreme Court concluded the following safeguards within Kentucky's protocol rendered the protocol in accord with the Eighth Amendment's prohibition against cruel and unusual punishment:

> 1) members of the IV team, responsible for establishing the IV lines, were required to have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman;
>
> 2) the execution team members, including the IV team members, were required to participate in at least 10 practice sessions per year,

---

[1] There are three differences between the two protocols. First, Arizona's protocol requires at least one year of professional experience for each member of the Medical Team, whereas SOP 135 only requires at least one year of experience for Injection Team members. Second, Arizona's protocol requires monitoring by microphone and video, in addition to an individual present in the execution chamber, whereas SOP 135 requires monitoring by microphone and one or more other forms of monitoring in addition to an individual present in the execution chamber. These two differences are irrelevant to this case, because each member of the SOP 135 Medical Team that will be used in Rhoades's execution has at least 15 years of professional experience, and video monitoring will be used. Finally, Arizona's protocol as approved in *Dickens* involves the use of only sodium pentothal whereas SOP 135 allows for pentobarbital to be used to anesthetize the inmate if sodium pentothal is unavailable. This difference is also irrelevant here because we approved the use of pentobarbital as an alternative to sodium pentothal in *Beaty*, 649 F.3d at 1072.

encompassing a complete walk-through of the execution procedures and the siting of catheters into volunteers;

3) the IV team was required to establish "redundant measures," setting up both primary and backup lines and preparing two sets of the lethal injection drugs before the execution commences; and

4) the warden and deputy warden were to be present in the execution chamber with the prisoner to watch for signs of IV problems (consciousness checks).

*Baze*, 553 U.S. at 56–57.

Here, in addition to the final version of SOP 135, the IDOC also proffered the affidavit and testimony of Jeff Zmuda, Deputy Chief of the Bureau of Prisons, as further evidence of the procedures that are actually to be used for Rhoades's execution, to show that these procedures include safeguards in line with those approved by the Court in *Baze*. Zmuda, as Deputy Chief, is in charge of planning, preparing, and implementing the SOP 135 protocol. His testimony is relevant to show the actual protocol that will be implemented, which in turn bears on the likelihood that Rhoades will suffer severe pain. Any injunctive relief must be tailored to the specific harm being complained of, which depends upon the specific facts in this situation that might create the constitutional harm. *See Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000); *cf. Dickens*, 631 F.3d at 1142 &

n.2 (considering the Arizona protocol as amended by a Joint Report and the

addition of provisions during the course of litigation).

The district court found that Zmuda credibly testified that the following

safeguards are in place for Rhoades's execution:

1) members of the SOP 135 Medical Team and Injection Team
responsible for IV insertion had the requisite experience.  Indeed, the
member with the least amount of experience had 15 years of experience
in his/her professional field;[2]

2) the Medical and Injection Team members (except for the Medical
Team Leader) had ongoing, regular experience establishing IV catheters,
in line with the experience required in *Baze*;

3) sufficient training practices and implementation of such practices,
namely Escort, Medical, and Injection Team members have been
receiving regular training in the execution procedures, in the execution
unit itself, since October 20, 2011.[3]  Between October 20, 2011 and
November 18, 2011, the date of execution, there will be 10 training
sessions, including several full rehearsals during which team members
will practice placing IV lines in volunteer subjects;

4) sufficient redundancy measures including three complete sets of
chemicals and the prior identification of the best sites on Rhoades to

---

[2] As noted above, SOP 135 only requires at least one year of experience for
Injection Team members, but Zmuda credibly testified each member of the SOP
135 Medical Team that will be used in Rhoades's execution has at least 15 years of
professional experience.  This does not amend the protocol, but it does show this
safeguard is in place for Rhoades's execution.

[3] In light of Zmuda's testimony, considered credible by the district court, we
reject Rhoades's contention that the execution facility is not sufficiently complete
to host required trainings.

insert the primary IV catheter as well as two separate locations for a backup IV catheter;[4]

5) meaningful consciousness checks if Rhoades remains conscious after administration of the sodium pentothal, including an initial check by the Medical Team as to why Rhoades is still conscious. After this check, the Medical Team leader will pass the information to the warden, along with the Medical Team's input. The warden then decides how to proceed, including whether to restart the procedure or to stop the procedure; and

6) expanded safeguards, including the presence of a medical doctor licensed by the Idaho Board of Medicine to give first aid and resuscitation, if a problem occurs in execution, and emergency technicians and an ambulance to give emergency medical assistance and transport if the need arises.

The district court correctly concluded that the SOP 135 protocol, as it will be implemented, is not only substantially similar to the Kentucky protocol as described in *Baze*, but includes more safeguards than the Kentucky protocol. In this light, Rhoades's claim that Idaho's lethal injection protocol violates the Eighth Amendment fails.

Next, Rhoades challenges the district court's conclusion that he did not show a substantial risk that the SOP 135 protocol will be implemented in an

---

[4] The district court also found credible Zmuda's assertion that if a peripheral line is not possible, the Medical Team, using related anesthetic and an ultrasound to assist in proper insertion, may use a central line catheter in Rhoades's femoral vein in the thigh to administer the drugs. Zmuda testified that this procedure would not require an incision, or "cut down," and that the team member responsible for this procedure regularly conducts insertion of central lines in his/her professional practice.

unconstitutional manner. Specifically, Rhoades argues that the IDOC did not engage in meaningful screening of candidates for the Execution Team or meaningful in-house training sessions, and will not engage in meaningful consciousness checks during Rhoades's execution.

A prisoner may bring a claim for a failure properly to implement a constitutional lethal injection protocol, but we held in *Dickens* that to succeed on such a claim, a prisoner would have to "raise issues of fact as to whether there is a substantial risk that he will be improperly anesthetized *despite* the Protocol's safeguards, including those added through amendment." *Dickens*, 631 F.3d at 1146 (citing *Baze*, 553 U.S. at 56). Rhoades does not meet this burden.

Zmuda testified about the involved process by which he and the Medical Team leader, an experienced registered nurse, interviewed and selected candidates to serve on the Execution Team. The district court found that in selecting the members of the Execution Team, Zmuda understood the enormity of his responsibilities, was candid on the limits of his medical knowledge, and relied on the expertise of the Medical Team leader, a trained medical professional, to assess the technical competency of the selected team members.

Zmuda also testified that before Rhoades's scheduled execution, the Execution Team would participate in 10 training sessions, including several full

rehearsals during which team members will practice placing IV lines in live, volunteer subjects, not just in mannequins as Rhoades contends. The district court found Zmuda's testimony about the nature and scope of the trainings to be credible and we conclude that there was no clear error in the district court's factual conclusions. The Kentucky protocol does not require any more training than what is set forth in SOP 135, and Rhodes offers no evidence that SOP 135 will not be followed.

Rhoades does not dispute that SOP 135 requires that the Medical Team leader be present during the execution to perform consciousness checks. This is more than was required in the Kentucky protocol where consciousness checks performed by non-medical personnel, namely by the warden present in the execution chamber, were deemed constitutional. *See Baze*, 553 U.S. at 55–56. Moreover, as the district court pointed out, anecdotal information about problems with the administration of three-drug lethal injection protocols in other states is not necessarily probative of the likelihood that Idaho will have difficulty implementing the SOP 135 protocol as designed.

We agree with the district court that Rhoades has not raised issues of fact as required by *Dickens* sufficient to support the inference that the SOP 135 protocol

will be improperly implemented in his case and that as a result he will be

improperly anesthetized and exposed to severe pain.

Finally, Rhoades argues that because of the existence of a one-drug protocol

that does not pose a risk of severe pain, the three-drug protocol, which does pose

some risk of severe pain, violates the Eighth Amendment because "the risk [of

severe pain] is substantial when compared to the known and available

alternatives." *Baze*, 553 U.S. at 62. We rejected the same argument in *Dickens*:

> We cannot embrace the claim that [Arizona's three-drug] Protocol is unconstitutional because a one-drug approach is a proven alternative. Under *Baze*, the failure to adopt an alternative protocol establishes an Eighth Amendment violation only if the current protocol creates a substantial risk of serious harm that the alternative protocol will reduce. *Baze*, 553 U.S. at 52. "[A] condemned prisoner cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative [exists]." *Id*. at 51 (internal quotation and citation omitted). Here, we have determined that the [three-drug] Protocol does not create a substantial risk of serious harm, and thus Arizona cannot be required to adopt a one-drug protocol, even if there is evidence that the [one-drug] protocol is safer and feasible.

*Dickens*, 631 F.3d at 1150 (citations omitted). Rhoades argues that there have been

more executions since *Dickens* which bolster his proof of the one-drug protocol's

efficacy and that at least three states have, since *Baze*, adopted one-drug protocols.

This argument does not change the binding and persuasive reasoning of the panel

in *Dickens* because Rhoades proffers no evidence that SOP 135 is in fact likely to

involve a substantial risk of severe pain. Considerations of federalism tell us that it does not matter if several states have decided to adopt one-drug protocols after *Baze*. What is important is that Idaho is free to choose to use the three-drug protocol if it does so in a way that is not likely to cause substantial risk of serious pain to Rhoades.

We conclude that Rhoades has not shown that he is entitled to injunctive relief on the merits of his claims. Because Rhoades has not shown that he is likely to succeed on the merits, which is required by *Winter* for injunctive relief, we need not and do not consider the district court's remaining conclusions.

The November 15, 2011 emergency motion for a stay of execution is denied.

**AFFIRMED.**

**Counsel**

Oliver W. Loewy and Teresa A. Hampton, Capital Habeas Unit, Federal Defenders Services of Idaho, Inc., counsel for Appellant Paul Ezra Rhoades.

Lawrence G. Wasden, Attorney General of Idaho, Mark A. Kubinski, Krista L. Howard, and L. LaMont Anderson, Deputy Attorneys General of Idaho, Idaho Department of Correction for Appellees Brent Reinke et al.