BERZON, Circuit Judge,
concurring in part and dissenting in part:
We find ourselves once again ruling on life and death issues on the eve of an *1079 execution. And once again, these issues arise on an appeal of the denial of an emergency motion for a stay of execution sought on the basis that the lethal injection mode of execution as the state will administer it will create such a substantial risk of serious pain as to violate the Eighth Amendment. See Towery v. Brewer, 672 F.3d 650 (9th Cir.2012); Beaty v. Brewer, 649 F.3d 1071 (9th Cir.2011); Landrigan v. Brewer, 625 F.3d 1144 (9th Cir.2010), vacated by — U.S. -, 131 S.Ct. 445, 178 L.Ed.2d 346 (2010).
In this instance, I cannot help but concur in the majority’s conclusion that Lopez has not at this point in the litigation demonstrated the requisite “serious question” as to whether that his execution will violate the Eighth Amendment if allowed to proceed. I also concur in most of the majority’s reasoning. In particular, Lopez has not proven that during the Towery execution, the pain suffered by Towery— for there assuredly was considerable pain, as the majority’s account of the hour-long difficulty in setting IV lines illustrates— was sufficiently severe to meet the high standard the Supreme Court has set for finding an Eighth Amendment violation in carrying out an execution. See Baze v. Rees, 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Without that proof, Lopez cannot project that he will be exposed to the risk of similar treatment, and therefore to a risk of harm so great as to constitute cruel and unusual punishment. Moreover, given the exceedingly short time before his execution, it will be impossible for Lopez ever to so prove, even if Towery did in fact suffer cruel and unusual punishment, or to avoid similar unconstitutional punishment for himself.
For me, unlike for the majority, that failure of proof cannot be the end of the story in this preliminary injunction appeal. It is far from clear to me that, were there the opportunity for this litigation to proceed in the ordinary course — that is, through full discovery — the requisite proof will not be available. And I lay the blame for present state of this litigation at the feet of the State.
In my view, Arizona has through its approach to devising, announcing, and recording the execution procedures it uses effectively denied Lopez of his procedural due process right to have his Eighth Amendment challenge heard at a meaningful time in a meaningful manner. It has done so by (1) granting the Director immense discretion in determining crucial aspects of the execution procedure rather than explaining in advance in any detail how the execution will be carried out; (2) ensuring that the important phases of executions are carried out behind closed doors; and (3) providing little information after-the-fact to the public, and to inmates awaiting execution and their lawyers as to the details of recent executions, including information as to the causes and impact of difficulties such those encountered during Towery’s execution — difficulties that, for all we now know, might be “sure or very likely to cause ... needless suffering,” Baze, 553 U.S. at 50, and might indeed have caused Towery such suffering.
1. As we recounted in the last appeal in this case: Although “the procedures for [carrying out the death] penalty must be implemented in a reasoned, deliberate, and constitutional manner[, o]ver time, the State of Arizona ... has insisted on amending its execution protocol on an ad hoc basis — through add-on practices, trial court representations and acknowledgments, and last minute written amendments — leaving the courts with a rolling protocol that forces us to engage with serious constitutional questions and complicated factual issues in the waning hours before executions.” Towery, 672 F.3d at 653. *1080 “This approach cannot continue,” we warned. Id.
But it has. Just as Arizona chose not to follow the protocol we upheld in Dickens v. Brewer, 631 F.3d 1139 (9th Cir.2011), instead amending its protocol by watering down to vagaries and assertions of directorial discretion its core protections, so it has backtracked on some of the assurances provided us by counsel during the first appeal in this case. In ruling on Moormann and Towery’s emergency motions for stays, we relied on the State’s representations made during oral argument regarding both the qualifications of the IV Team and access to counsel. Towery, 672 F.3d at 658. We viewed these representations as binding on the State, and explicitly conditioned our holding on them. Id. Now we are told that the access to counsel has been cut back from what we approved, that any in-person contact with counsel the day of the execution is available only at the Director of the Arizona Department of Corrections’ (“Director”) discretion, and that although the expectation is that the IV Team for Lopez’s execution will again consist of a doctor and a nurse, the Director has no obligation to assure that such medically qualified personnel are available and may not do so in the future.
The upshot is that Lopez, and others facing execution in the future, are not presented with any written, binding protocol such as the ones in Baze and in Dickens on which to focus in determining whether their impending execution will meet constitutional standards. Instead, the information they are provided consists largely of last-minute representations by counsel for the Director as to how the Director expects to carry out the immediately impending execution.
This mode of proceeding is particularly problematic here because, in my view, the January, 2012 protocol is probably unconstitutional as written in significant respects. We never reached the question in the previous appeal of the constitutionality of the written protocol, and the majority does not reach it here, because the last minute representations made by counsel filled in the likely constitutional gaps with for-this-execution-only promises concerning how the Director was prepared to constrain his declared discretion. But on the issue of the IV Team’s qualifications and training and of the issue of access to counsel, the written protocol appears to me both to “create[] a demonstrated risk of severe pain” Baze, 553 U.S. at 61, and to sanction the possibility of an unconstitutional denial of the right to counsel.
For example, where the protocol approved in Dickens required that IV Team members be “medically trained,” Arizona’s January, 2012 protocol now requires only that the individuals inserting peripheral IV lines be “appropriately trained.” Where the earlier protocol required that IV Team members have “current and relevant professional experience,” it now requires only “one year of relevant experience,” which could have been in the distant past. Towery, 672 F.3d at 654. In the Arizona executions reviewed in West v. Brewer, for instance, the IV setting in the challenged executions were carried out by a correctional officer who hadn’t set an IV line in 15 years and had no specific recollection of the military training in which he was taught this procedure. 2011 WL 6724628, at *6 (D.Ariz. Dec. 21, 2011).
These concerns are only heightened by the protocol’s equally watered-down training requirements. The protocol we approved in Dickens required that the IV Team members “responsible for inserting the IVs” must participate in “at least ten rehearsals per year.” 631 F.3d at 1143. The 2012 protocol requires only “one training session ... within one day prior to a scheduled execution.” Towery, 672 F.3d *1081 at 655. These standards are so lax as to both qualifications and training that they may well create a significant risk that the team that is assembled in any given execution will be incompetent to carry out the execution without causing severe pain.
In addition to permitting the Director to assemble an incompetent IV Team, the 2012 protocol also permits the Director to restrict beyond the bounds permitted by the Constitution an inmate’s right to counsel in the final hours before he is to be executed. Arizona’s practice under earlier protocols had been to permit non-contact visits by both attorneys and a facility chaplain the morning of the execution, in many instances up until 45 minutes before the scheduled time of execution. Id. at 658. The 2012 protocol, however, grants the Director the discretion to forbid attorney visits — but not the visits the facility chaplain — after 9 p.m. the night before an execution. Id. at 655.
The constitutional right of access to the courts includes the right to in-person visits with counsel. Ching v. Lewis, 895 F.2d 608, 610 (9th Cir.1990). That right cannot be restricted without some legitimate penal justification. Id.; see also Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The state has to this point offered none. While it has suggested that allowing attorney visits in accordance with the old protocol could cause delays, Moormann’s execution, to cite just one example, proceeded in a timely manner despite his meeting with his attorney up until 9:15 a.m. The state’s interest in maintaining the confidentiality of IV Team members also cannot justify this restriction, as facility chaplains are assured access on the morning of the execution under the new protocol; presumably, chaplains are as observant as lawyers regarding who is present at the site of the execution. Moreover, the attorneys for condemned prisoners in Arizona have been required to agree to confidentiality regarding the identity of the individuals preparing to carry out the execution before obtaining access to their clients and have done so — without, as far as the record shows, any breaches in confidentiality. The upshot is that neither the delay concern nor the confidentiality rationale rests on any factual basis in the present record.
2. Despite these apparent deficiencies in the governing protocol, it is impossible at this juncture to say with the requisite degree of assurance whether the particular procedures that will be used to execute Lopez will create a “substantial risk of serious harm.” Towery, 672 F.3d at 653 (quoting Baze, 553 U.S. at 49-50, 128 S.Ct. 1520). This uncertainty is not due to any failing on the part of Lopez or his attorneys. Instead, by continually making representations at the last minute regarding self-imposed, but transient, limitations on the broad discretion accorded by the protocol, the Director has both precluded the affected inmates from litigating the risk of serious harm created by the protocol itself and cabined those inmates’ ability to litigate fully, after the usual discovery and opportunity to obtain expert testimony and other evidence, the actual circumstances of their own executions, and to do so in advance of the day they will be put to death. Their attorneys have been relegated to repeated, exhausting, preliminary injunction eve-of-execution challenges to the constantly moving target that Arizona’s practices have created. Such challenges necessarily proceed on truncated records, and appeals are limited by the abuse-of-diseretion standard. Lands Council v. McNair, 537 F.3d 981, 986 (9th Cir.2008) (en banc).
Moreover, other aspects of the manner in which Arizona has been carrying out its now-frequent executions — there have been three in the last four months — further sty *1082 mie any meaningful ability of condemned prisoners to litigate before they are put to death the constitutionality of the procedures that will be used to execute them. Aside from challenging the written protocol on its face, another way condemned prisoners can attempt to demonstrate the likely impact of the procedures that will be used during their execution is to demonstrate that past executions carried out in accord with similar procedures have resulted in executions that violated the Eighth Amendment. But that approach can succeed only if there is detailed information available concerning past executions carried out with similar procedures.
Arizona puts impenetrable roadblocks in the way of obtaining such information in time to use it before a condemned prisoner is executed. First, the state insists upon extreme secrecy in carrying out executions. Witnesses are allowed only at the very end of the lethal injection process, during the actual administration of the lethal drugs after the IV lines have been set and the drugs concocted and readied for administration. Most of what can go wrong will go wrong before the small part of the execution process exposed to public view.
We have held that the First Amendment requires broader public access to the process of carrying out executions — which are, after all, carried out as a result of public decisions, in implementation of a controversial public policy. See California First Amendment Coalition v. Woodford, 299 F.3d 868 (9th Cir.2002). There has been no First Amendment challenge of which I am aware to Arizona’s contrary practice, and I am not suggesting that we should hold the practice unconstitutional on that basis at this juncture. But the fact that California and other states, see Ohio Execution Policy Ol-COM-11, § IV.G.4, have carried out their executions in full view suggests one way in which Arizona could provide a fair opportunity to challenge future executions conducted similarly— namely, by exposing to the public the actual impact of the procedures used and thereby permitting exposure through media and witnesses of any indications of serious pain during those executions.
Second, as the majority opinion describes, Arizona has recently increased the secrecy with which it conducts executions in another way: Although it used to keep detailed logs concerning what occurred during executions, its recent logs have been summary and perfunctory, making them useless for the purpose of discovering why whatever went wrong went wrong, and what was the impact on the prisoner being executed. One can only surmise that the reason for this change was to make it more difficult for condemned prisoners to litigate the nature of the risk created by the procedures used in the past; no other reason for recording less about the execution process than was done before comes to mind.
Third, as the majority opinion also describes, Arizona makes sure that the prisoners about to be executed cannot themselves describe any pain they suffered or mistakes made during the execution, by threatening to cut off their last statement if they do so. According to the undisputed record in this case, inmates have been told that their microphones will be cut off if they make statements critical of the Arizona Department of Corrections. In an attempt to adjust to this edict, Towery and his lawyer developed a code by which Towery indicated that he sought access to counsel during the setting of the IV lines and was denied, and may have indicated that the execution procedures had caused him pain.
Finally, in a recent letter to Director Charles Ryan, Lopez’s lawyers, who also represent the other plaintiffs in this law *1083 suit, have requested that they be permitted to observe the pre-execution process or observe videotapes of it. With appropriate assurances of confidentiality as to the identity of the individuals participating in the execution, such a procedure could provide a measure of procedural due process to other plaintiffs, if not to Lopez, by allowing some meaningful access to essential information that the state refuses otherwise to provide. But the request has not been granted.
These secrecy restrictions and refusals of public and attorney access, taken together, leave condemned prisoners, their attorneys, the district court, and this court with precious little indication of whether past executions have actually been conducted in a constitutional manner. The condemned clients, without access to their attorneys, are left to communicate with them in elaborate codes during their last statements, while we are left to parse cryptic execution logs and autopsy reports in an effort to determine whether an inmate suffered pain, and if so, how much.
The trouble that plagued Towery’s execution highlights the practical problems this obsessive secrecy creates for any meaningful litigation in the constricted time periods permitted by Arizona’s moving target approach to execution procedures. After approximately half an hour trying to site a functioning catheter, the Director decided, for reasons unknown, to contact the Attorney General’s office and provide “an update regarding the IV process.” So the Director had access to counsel during the execution, although Towery — despite asking for such access at some point — did not. After 50 minutes— just 10 minutes short of the hour time limit allotted for this task under the protocol reviewed in Baze, 558 U.S. at 55, 128 S.Ct. 1520 — a femoral catheter had finally been placed. Only 59 minutes into the execution did the IV team succeed in placing a backup line (in a location known to create a danger of pain if used to administer drugs, so the backup line was either useless or possibly unconstitutional). An autopsy showed that Towery’s arms had been pierced several times, and that his femoral artery had been pierced as well.[1] This entire process was conducted behind closed doors and, as the majority notes, recorded in only the most general of notes. Because of the secrecy, we have no way of knowing the degree of pain caused Towery; for all we know, it reached the standard for unconstitutional punishment set in Baze. It is possible that discovery during the course of this lawsuit could establish, through expert evidence and depositions of those present that it did — but by then, Lopez will be long dead, as, in all likelihood, will be some or all of the remaining plaintiffs. None of the executed individuals will have had a fair chance to litigate the constitutionality of the procedures applied to them during their execution.
To my mind, this combination of circumstances, not any one of them — the last minute changes in protocols; the even more last minute attestations to limitations on the Director’s discretion for individual executions; the lack of access of the public and counsel to the pre-execution procedures; the failure to record in any detail what occurs during executions; and the restrictions on any reports by the condemned prisoners themselves of pain encountered during the execution process— amounts to a procedural due process violation. Lopez clearly has a liberty interest in avoiding a mode of execution that con *1084 stitutes cruel and unusual punishment. See Serrano v. Francis, 345 F.3d 1071, 1078 (9th Cir.2003). The events that took place during the Towery execution demonstrate that there is at least some risk that Lopez will be subjected to such an unconstitutional execution. Yet, Lopez has effectively been denied his right to be heard in a meaningful manner before he dies concerning the constitutionality of the processes that will be used to execute him. And this due process problem is not intractable; it could be solved in a variety of ways, including (1) providing a detailed written protocol that restricts the Director’s discretion and is actually followed in executions; (2) keeping and making available detailed accounts of the actual execution processes, including any evidence of the impact on the pain perception by those executed; (3) providing either for public access or for more limited access by counsel to the pre-execution proceedings.
“[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process.” Mathews v. Eldridge, 424 U.S. 319, 344, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Here, the risk of error is enormous. There is no redo, and the result of the constitutional error, if it occurs, will be severe pain, or, at least, a high likelihood of suffering such pain. Without at least one of the protections I have indicated, the plaintiff will be dead before it is possible to have a hearing as to the constitutionality of his execution that even approximates the access to the relevant facts ordinarily accorded litigants. And the absence of these protections is the result of Arizona’s choices, in several instances the choice to cut back on procedural protections previously accorded.
Executing someone convicted of a capital crime is a grim endeavor. Reviewing the details of impending executions to assure against unconstitutional executions is grim as well, a task judges would rather avoid. Yet, while we as judges cannot and should not micromanage executions, we do have an obligation to stand as a last bulwark against excessively painful administrations of the death penalty. To do that, we need to be presented with the relevant facts, gathered in some feasible fashion. As matters now stand, Arizona has made the gathering of such facts by condemned prisoners so difficult that meaningful judicial consideration at a relevant time is not possible. By doing so, Arizona has denied Lopez, and others awaiting execution in Arizona, due process of law. I would stay Lopez’s execution until this denial of due process is corrected by one or more of the means I have indicated.[2]

. The record establishes that administering phenobarbital into the femoral artery rather than the vein can be veiy painful.

. Given the press of time under which we have operated in this case, I may wish to further explain my views on this matter at a later date.